ATTORNEY FOR APPELLANT
Victoria L. Bailey
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

Ann L. Goodwin
Special Deputy Attorney General

# In the
# Indiana Supreme Court



No. 49S04-1102-CR-85

RICHARD JOSLYN,

*Appellant (Defendant below),*

v.

STATE OF INDIANA,

*Appellee (Plaintiff below).*

Appeal from the Marion Superior Court, No. 49G22-0812-FC-272486
The Honorable Carol Orbison, Judge

On Petition to Transfer from the Indiana Court of Appeals, No. 49A04-0908-CR-460

**February 16, 2011**

**Shepard, Chief Justice.**

Today we address the importance of protective orders for Hoosiers in two cases. In this case we hold that a minor defect in the service of a protective order was cured by Joslyn's statements to police and his testimony at trial. Allowing protective order respondents to evade enforcement through technicalities is counter to the purpose of the Civil Protection Order Act and simply dangerous for those whom the act is designed to protect. Therefore, we affirm Joslyn's convictions for stalking and invasion of privacy.

**Facts and Procedural History**

In late 2007 or early 2008, Stephanie Livingston moved back to Indianapolis after a breakup with her youngest son's father. Livingston and her third cousin Richard Joslyn agreed that she would stay with Joslyn and his son rather than with her mother because there would be more room for Livingston and one of her sons to live. Livingston struggled with alcohol while living with Joslyn, drinking on a "daily basis for almost the whole six months I was there." (Tr. at 22.)

After a brief reconciliation with her son's father, Livingston moved back in with her mother, about a quarter of a mile from Joslyn's home. Livingston eventually became aware of and watched a video Joslyn recorded of the two of them engaging in sexual intercourse. Livingston had no memory of the act.

After moving back with her mother, Livingston applied ex parte for a protective order under the Indiana Civil Protective Order Act.[1] The court granted her request and issued the order on November 10, 2008. The protective order prohibited Joslyn from having any contact with Livingston.

On November 13, a deputy with the Marion County Sheriff's Department served Joslyn with a copy of the protective order by leaving a copy attached to the door of his residence. (State's Ex. 18; Tr. at 23, 165, 169.) The deputy did not indicate on the return of service form that a copy of the order was also mailed to Joslyn's last known address as required by Indiana Trial Rule 4.1. (State's Ex. 18; Ind. Trial Rule 4.1(A)(3), (B).)

On evening of November 14, Livingston and some friends went to a liquor store. While Livingston was inside the store with one of her friends, the others noticed Joslyn observing them from across the street. Later that evening, the group went to a local bar where they spotted Joslyn watching them from the end of the bar. While Livingston was on the dance floor, Joslyn stood at the edge of the dance floor watching Livingston throughout a song.

---

[1] Ind. Code § 34-26-5 (2008 & Supp. 2010).

On November 17, Livingston was visiting a friend, Richard Neutzman. While she was there, Neutzman received a call, which he put on speakerphone. Livingston heard Joslyn asking whether Neutzman knew where Livingston was. On another visit to Neutzman's house, Livingston saw Joslyn peering through a window.

On November 18, Livingston's mother found a note on the front porch of their home. Livingston recognized the handwriting as Joslyn's. The next day, Livingston found a rose on the doormat of the home.

On November 23, Livingston was entertaining friends at the home when she heard a crash outside. When she looked outside, she saw Joslyn running away and discovered her friend's vehicle had four windows smashed.

On November 25, Livingston and her cousin observed Joslyn hiding under Livingston's home in the crawl space. The next day Livingston saw Joslyn looking into the window of her home. Livingston called 9-1-1. The police later apprehended Joslyn with help from a canine officer. The dog located him hiding in a van on a neighbor's property.

On December 3, 2008, the State charged Joslyn with class C felony stalking,[2] four counts of class A misdemeanor invasion of privacy[3] and a class A misdemeanor resisting law enforcement.[4] The case went to trial by jury. At the close of the evidence, the court granted Joslyn's motion for judgment on the evidence as respects the charge of resisting law enforcement. The jury found Joslyn guilty on the remaining counts.

On appeal, Joslyn has challenged the sufficiency of the evidence to support his convictions, arguing the State did not prove he was properly served with the protective order. The Court of Appeals affirmed, citing Joslyn's admission that he received the notice left at his home by an agent of the State as sufficient to permit his conviction for invasion of privacy and

---

[2] Ind. Code § 35-45-10-5(b)(2) (2008).
[3] Ind. Code § 35-46-1-15.1 (Supp. 2010).
[4] Ind. Code § 35-44-3-3 (Supp. 2010).

stalking. Joslyn v. State, 928 N.E.2d 906 (Ind. Ct. App. 2010) (table).  We think the Court of Appeals was right to affirm, and grant transfer to address the service of protective orders.

## Sufficiency of Evidence

When the claim is a sufficiency of evidence challenge, we do not reweigh the evidence or judge the credibility of the witnesses, and we respect a fact-finder's "exclusive province to weigh conflicting evidence."  Alkhalidi v. State, 753 N.E.2d 625, 627 (Ind. 2001).  We "consider only the probative evidence and reasonable inferences supporting the verdict."  McHenry v. State, 820 N.E.2d 124, 126 (Ind. 2005).  We will affirm "if the probative evidence and reasonable inferences drawn from the evidence could have allowed a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt."  Tobar v. State, 740 N.E.2d 109, 111–12 (Ind. 2000).

Joslyn's convictions were based on his violation of the protective order obtained by Livingston.  We first note that the statutes defining the crimes of stalking and invasion of privacy do not require actual service of a protective order for a conviction.  Invasion of privacy does require "knowingly or intentionally violat[ing]" an order, and the stalking statute requires that the "person has been given actual notice of the order." Ind. Code §§ 35-46-1-15.1, 35-45-10-5(b)(2).  Joslyn argues that implicit in these crimes is a requirement that the protective order was properly served under the Indiana Rules of Trial Procedure. (Appellant's Br at 6–7.)

The Court of Appeals affirmed Joslyn's convictions in accordance with earlier decisions holding that actual notice was sufficient for a conviction if the defendant received actual notice of the protective order from an agent of the State.  Joslyn v. State, No. 49A04-0908-CR-460, slip op. at 3–4, (Ind. Ct. App. June 30, 2010); see Dixon v. State. 869 N.E.2d 516 (Ind. Ct. App. 2007); Hendricks v. State, 649 N.E.2d 1050 (Ind. Ct. App. 1995).

In the present case, a process server testified that she left a copy of the order at Joslyn's home. There was no indication that she also sent a copy of the order to his house by first class

4

mail as required under our Trial Rules. See Ind. Trial Rule 4.1(B) (requiring a copy be sent by mail when an order is left at a dwelling house).

The trial court admitted, over objection, a recording and transcript of a statement Joslyn made to police:

> Q: OK, and you're aware you have a restraining order against you?
> A: Yeah. Yeah, I know I got a restraining order. I ain't, I haven't been callin' her or talkin' to her or seein' her. Uh, as a matter of fact, she's been callin' my house . . . .
>
> * * * * *
>
> Q: Do you know, do you know when your protective order was effective?
>
> A: It was more like the 20th or somethin'. . . .
>
> * * * * *
>
> Q: Uh, how about the 10th and it was serve [sic] to you on the 13th?
> A: OK.
>
> * * * * *
>
> Q: OK. Right now, you need to help yourself.
> A: This, No…November 10th was when the restraining order or whatever was and then I got it three days later, so the 13th, so I've only had it for a couple weeks now (sigh) and nothin's been goin' on and then all of a sudden (pause) Sh** happens?

(State's Ex. 16, pp. 3–4, 44.) Joslyn also testified at trial admitting that he found the protective order at his residence, but could not recall when. (Tr. at 285–86.)

We agree with the Court of Appeals that Joslyn's admission of receipt is sufficient to sustain his convictions. As the court noted, the purpose of the Indiana Civil Protection Order Act is to promote the protection and safety of all victims of domestic violence and prevent future incidents. It would run contrary to this purpose if we were to embrace Joslyn's contention that a defendant does not violate the criminal code because of some defect in civil process even where the court had in fact issued a protective order and the defendant in fact knew it had done so.

5

The Court of Appeals reliance on Hendricks and Dixon, was well placed. In Hendricks, the Mercado family obtained an emergency protective order against Hendricks. Six days later, Hendricks called the Mercado's home and Bernadette Mercado informed him of the protective order and told him he was not to have any contact with the family. Later that day, Hendricks called the home again and an officer who was at the home spoke with Hendricks and told him of the protective order and its parameters. The next day, Hendricks came within 1000 feet of Altimease Mercado and was arrested in violation of the protective order. Hendricks appealed claiming he did not have notice of the protective order, but the Court of Appeals affirmed holding the evidence was sufficient that Hendricks' knowingly violated the emergency protective order. Hendricks, 649 N.E.2d at 1052.

The evidence that Bernadette Mercado informed Hendricks of the protective order and its parameters (that he was not to have any contact with the family) could have by itself been sufficient to prove Hendricks' knowledge of the protective order. The additional notification by the officer to Hendricks would simply have been cumulative evidence of his knowledge of the protective order.

In Dixon, Demetrice Bruno obtained a protective order against Dixon. Later, an officer was dispatched to Bruno's home where Demetrice and Dixon were engaged in a verbal dispute. The officer performed a warrant check and discovered there was a protective order against Dixon, but Dixon had not been served with it. Bruno showed a copy of the order to the officer and told him she had previously given Dixon a copy. The officer advised Dixon that he had been served and was not to come back to Bruno's residence. Later that day Dixon returned, and he was arrested.

On appeal, Dixon argued he did not have sufficient notice of the protective order. The Court of Appeals affirmed:

> [Dixon] claims that the only evidence that he knew of the protective order was the hearsay testimony of Officer Gomez regarding Bruno's claims that she gave Dixon the order. However, it is clear from Officer Gomez's testimony that he informed Dixon

6

of the protective order and advised Dixon that he was not to return to Bruno's residence.

Dixon, 839 N.E.2d at 520. Had there been testimony from Bruno that she had given Dixon a copy of the order, that testimony could have been sufficient to sustain a conviction for invasion of privacy, assuming the finder of fact thought it credible. The additional oral notice by the police officer would again be cumulative evidence.

One need only brush the surface of domestic violence statistics to realize the importance of protective orders in the prevention of domestic and family violence. The declared legislative intent that these provisions in the Code be interpreted in a way that will "promote the: protection and safety of all victims of domestic or family violence in a fair, prompt, and effective manner; and [the] prevention of future domestic and family violence." Ind. Code § 34-26-5-1 (2008). Joslyn's proposed rule that one who acknowledges actual receipt at his home but not an additional copy by mail commits no violation would have real world implications placing far too many Hoosiers at risk of becoming a domestic violence statistic.

Therefore, limiting an actual notice exception to instances when it comes from an agent of the State does little to further the protection of petitioners or the protection order process if there is evidence the respondent already has knowledge of the order. Here, Joslyn admitted in statements to police and again during trial that he was aware of the protective order and had read its terms. (Tr. at 286.) That sufficed to prove that he "knowingly" violated the order.

**Conclusion**

Joslyn's convictions for stalking and invasion of privacy are affirmed.

Dickson, Sullivan, Rucker, and David, JJ., concur.

7