Scott PATTISON, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 85A02–1101–CR–88.

Court of Appeals of Indiana.

Dec. 9, 2011.

Transfer Denied Feb. 8, 2012.

**14**

Stanley L. Campbell, Fort Wayne, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Indianapolis, IN, Jodi Kathryn Stein, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BARTEAU, Senior Judge.

### STATEMENT OF THE CASE

Appellant Scott Pattison appeals his conviction of murder, a felony. Ind.Code § 35–42–1–1 (2007). We affirm.

### ISSUES

Pattison raises six issues, which we consolidate and restate as:

I. Whether the trial court abused its discretion by admitting surveillance equipment and a surveillance video into evidence.

II. Whether the trial court erred by allowing the jury to examine a weightlifting machine ("the machine") during their deliberations.

III. Whether the trial court abused its discretion by refusing Pattison's request to question jurors about their examination of the machine.

IV. Whether the evidence is sufficient to sustain Pattison's conviction.

### FACTS AND PROCEDURAL HISTORY

On July 2, 2009, at 12:14 p.m., Pattison called 911 to report that he was driving his wife, Lisa Pattison, to the hospital in Marion, Indiana, and wanted a police escort. He indicated that she was not breathing. A few minutes later, an ambulance and a police officer intercepted Pattison's truck en route to the hospital. Lisa was placed in the ambulance and taken to the hospital, where she was pronounced dead.

Pattison, who owned a roofing business, told the officer that he had come home from work and found Lisa's body in their exercise room. Pattison further stated that he found Lisa lying on a weightlifting bench with the weight bar pinned across her throat. He administered CPR, and when that did not help, he put Lisa in his truck and drove to the hospital as he called 911.

Later that day, after questioning Pattison, detectives went to Pattison's house and searched it. In the garage, the detectives noticed a surveillance system that was connected to cameras mounted outside the house. The recording device had a slot for a DVD, but no DVD was present. The detectives assumed that without a DVD, the system had not recorded anything.

On July 15, 2009, an employee of Koorsen, the company that had installed Pattison's surveillance system, called the detectives. The employee told them that the system recorded to an internal hard drive and that the DVD slot was used only to transfer a recording from the hard drive to a DVD. Subsequently, the detectives sought and obtained a search warrant for the surveillance system and seized the system from Pattison's house. Upon examining the system, the detectives found a recording of Pattison's driveway from July 2, 2009. The recording showed that Pattison had returned home several hours prior to the time he told the police he had come home.

A grand jury indicted Pattison for murder, and he was tried by a jury. During the trial, the court admitted into evidence the components of the surveillance system and the system's video from July 2, 2009. In addition, the weightlifting machine was placed in the courtroom and admitted into evidence. The machine consisted of a bar on which weights could be placed, with a system of guide bars along which the weight bar could be lifted up and down.

The weight bar could be locked into place at several points along the guide bars. A person could use the machine while standing or while lying on a bench under the weight bar. The machine was too large to put in the jury room, so it remained in the courtroom throughout the trial. During jury deliberations, jurors came into the courtroom when no one but the jury was present and examined the machine.

The jury determined that Pattison was guilty of murder. After the verdict but before sentencing, Pattison filed a motion for mistrial, asserting that the jury engaged in misconduct by performing experiments on the machine during deliberations. The trial court denied his motion for mistrial and sentenced him. This appeal followed.

### DISCUSSION AND DECISION

### I. ADMISSION OF SURVEILLANCE EQUIPMENT AND THE SURVEILLANCE VIDEO

A decision on the admission of evidence is subject to appellate review for abuse of discretion. *McHenry v. State*, 820 N.E.2d 124, 128 (Ind.2005). We reverse the trial court's decision only when it is clearly against the logic and effect of the facts and circumstances before the court. *Granger v. State*, 946 N.E.2d 1209, 1213 (Ind.Ct. App.2011). We do not reweigh the evidence, and we consider the evidence most favorable to the trial court's ruling. *Scott v. State*, 883 N.E.2d 147, 152 (Ind.Ct.App. 2008).

Pattison argues that the trial court violated his federal and state constitutional protections against illegal search and seizure by admitting the surveillance equipment and the surveillance video into evidence. We address each claim in turn.

### A. THE FOURTH AMENDMENT

The Fourth Amendment to the United States Constitution provides, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Pattison contends that the search warrant pursuant to which the police entered his house and seized the surveillance equipment was not supported by probable cause due to defects in the probable cause affidavit.

■ A search warrant and its underlying probable cause affidavit must comply with the Fourth Amendment prohibition on unreasonable searches and seizures, as well as Indiana constitutional and statutory law. *Jackson v. State*, 908 N.E.2d 1140, 1143 (Ind.2009). The Indiana statute governing search warrants provides, in relevant part:

[N]o warrant for search or arrest shall be issued until there is filed with the judge an affidavit:

(1) particularly describing:

 (A) the house or place to be searched and the things to be searched for; or

 (B) particularly describing the person to be arrested;

(2) alleging substantially the offense in relation thereto and that the affiant believes and has good cause to believe that:

 (A) the things as are to be searched for are there concealed; or

 (B) the person to be arrested committed the offense; and

(3) setting forth the facts then in knowledge of the affiant or information based on hearsay, constituting the probable cause. . . .

When based on hearsay, the affidavit must either:

(1) contain reliable information establishing the credibility of the source and of each of the declarants of the hearsay and establishing that there is a factual basis for the information furnished; or

(2) contain information that establishes that the totality of the circumstances corroborates the hearsay.

Ind.Code § 35–33–5–2 (2005).

 In deciding whether to issue a search warrant, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Jackson*, 908 N.E.2d at 1142 (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). Probable cause is a fluid concept, which is decided based on the facts of each case. *Cheever–Ortiz v. State*, 825 N.E.2d 867, 872 (Ind.Ct.App. 2005). The duty of the reviewing court is to determine whether the magistrate had a substantial basis for concluding that probable cause existed. *Id.* at 871. A substantial basis requires the reviewing court, with significant deference to the magistrate's determination, to focus on whether reasonable inferences drawn from the totality of the evidence support the determination of probable cause. *Id.*

 Pattison argues that the probable cause affidavit was invalid because it was based on stale information. As a general rule, stale information will not support a finding of probable cause. *Shell v. State*, 927 N.E.2d 413, 418 (Ind.Ct.App.2010). Our courts have not established a bright-line rule regarding the amount of time that may elapse between obtaining the facts upon which the search warrant is based and the issuance of the warrant. *Id.* Instead, whether the information is tainted by staleness must be determined by the facts and circumstances of each particular case. *Id.*

In this case, Detective Michael Davis stated in the probable cause affidavit that in 2001, the Wabash County Sheriff's Department received a report that Pattison had asked a person to kill Lisa. Although this information is relevant to the type of crime at issue here, the report is at least eight years old and is too stale to give rise to more than a mere suspicion. Similarly, Davis' affidavit included a statement by Leah Frazier, a friend of Lisa's. Frazier told Davis that Lisa had told Frazier "6–8 months ago" that Lisa had put internet tracking software on Pattison's computer because he had been having an affair. Appellant's App. p. 19. Frazier further related that "as of January 2009," the program was still on his computer. *Id.* This information may shed some light on Pattison's motives but is also too remote in time to give rise to more than a mere suspicion of wrongdoing.

The probable cause affidavit further describes Davis' interview with Christine Smith, Lisa's sister. Smith told Davis that two years ago, Pattison removed money from Pattison and Lisa's retirement accounts. This information is unrelated to the crime at issue here and is too old to support a finding of probable cause.

Davis's affidavit further states that Marie Lloyd had spoken with Sergeant Tyler Guinen and told him that in December 2008, Pattison had asked Lloyd to do an appraisal of Pattison and Lisa's house, without Lisa's knowledge, because Pattison was contemplating a divorce. Lloyd's information is also too remote in time to provide more than a mere suspicion that Pattison and Lisa were experiencing marital difficulties.

We conclude that the portions of the affidavit discussed in the preceding paragraphs are stale and cannot provide a basis for the trial court's probable cause determination. The remaining portions of the affidavit are not stale.

■ Next, Pattison argues that the probable cause affidavit is invalid because it is based on uncorroborated hearsay. Uncorroborated hearsay from an informant whose credibility is unknown, standing alone, cannot provide probable cause to issue a search warrant. *State v. Foy*, 862 N.E.2d 1219, 1225 (Ind.Ct.App.2007), *trans. denied.* As is noted above, when a probable cause affidavit includes hearsay information, the affidavit must either: (1) contain reliable information establishing the credibility of the source and of each of the declarants of the hearsay and establishing that there is a factual basis for the information furnished; or (2) contain information that establishes that the totality of the circumstances corroborates the hearsay. Ind.Code § 35–33–5–2(b).

■ In this case, Davis' affidavit includes further information provided by Lisa's sister, Smith. Smith stated that she was Pattison and Lisa's financial advisor, and that approximately a month before Lisa's death, Lisa changed the beneficiary of her life insurance policy from her son and Pattison, as joint beneficiaries, to her son alone. Smith did not give any documents to Davis to support her assertion, and the affidavit lacks any independent corroboration of Smith's credibility. Consequently, Smith's assertions are uncorroborated hearsay and cannot support the probable cause determination.

■ Next, the probable cause affidavit described Pattison's call to 911, in which Pattison told the dispatcher that he had found Lisa under a set of weights and that her face was blue. Pattison concedes that this is "accurate information" despite being hearsay. Appellant's Br. p. 18. The affidavit also discusses the results of an autopsy on Lisa. Dr. Scott Wagner, who performed the autopsy, found "unexplained Peticiae [sic]" on Lisa's back and the back of her neck. Appellant's App. p. 19. Dr. Wagner suggested that the presence of "Peticiae [sic]" was inconsistent with Pattison's description of finding Lisa with weights on her throat. Dr. Wagner's statements are hearsay, but his statements are based on personal knowledge and are therefore credible. *See Foy*, 862 N.E.2d at 1226 (determining that emergency medical personnel's hearsay statements were reliable because they were based on personal observation).

■ Next, Davis stated in his affidavit that when he interviewed Pattison on July 2, 2009, Pattison conceded that he and Lisa were having marital problems because he had been having an affair. Pattison further conceded that he had filed for divorce earlier in 2009, although he asserted that he later decided to try to reconcile with Lisa. Pattison's statements are hearsay, but the police corroborated Pattison's statements by: (1) examining court records to confirm Pattison's divorce filing; and (2) finding a letter in Pattison and Lisa's house on July 3, 2009, apparently in Lisa's handwriting, that referenced marital discord.

■ Davis also stated in his probable cause affidavit that on July 15, 2009, he was contacted by an employee of Koorsen, who told Smith "that Scott Pattison had called and asked how to delete the video from his security system." Appellant's App. p. 20. Pattison correctly notes that this statement is hearsay, and the affidavit provides no corroboration for that statement. Therefore, we conclude that the statement does not support a finding of probable cause. Nevertheless, the Koor-

sen employee also told Davis that the surveillance system recorded to a hard drive and that a DVD was only necessary to copy saved data. In the affidavit, Davis corroborated this statement by noting that he had inspected the system during his previous search of the house and that he had noticed the absence of a DVD. Thus, one may reasonably infer from the Koorsen employee's statement that the surveillance system may have had data from the date of Lisa's death.

In summary, setting aside stale information and uncorroborated hearsay, the probable cause affidavit indicates that an autopsy produced evidence that conflicted with Pattison's explanation for Lisa's death, that Pattison and Lisa were having marital problems to the point that Pattison had filed for divorce, and that a camera surveillance system may have recorded footage outside of the Pattisons' home on the day that Lisa died. We acknowledge that this is a close case. However, in determining whether an affidavit provided probable cause for the issuance of a search warrant, doubtful cases are to be resolved in favor of upholding the warrant. *Mehring v. State*, 884 N.E.2d 371, 377 (Ind.Ct.App.2008), *trans. denied.* Thus, reasonable inferences drawn from the totality of the evidence indicate that there was a fair probability that evidence of murder would be found in the surveillance system, and the trial court had a reasonable basis to issue the search warrant. The admission of the surveillance system equipment and video into evidence did not violate the Fourth Amendment.

## B. ARTICLE 1, SECTION 11

Article 1, Section 11 of the Indiana Constitution governs search and seizure, and it provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized.

As is the case with the Fourth Amendment, the principles of Article 1, Section 11 are codified in Indiana Code section 35–33–5–2, set forth above. *See Foy,* 862 N.E.2d at 1225.

In this case, Pattison argues that the probable cause affidavit does not support the issuance of the search warrant and subsequent seizure of his surveillance system because the affidavit consists of uncorroborated hearsay. As is discussed above, the corroborated hearsay and other valid statements in the affidavit establish that the results of the autopsy were inconsistent with Pattison's account of Lisa's death, that he and Lisa were experiencing marital problems so severe that Pattison filed for divorce, and that a surveillance system at the house may have captured footage of Pattison and Lisa's home on the day of her death. We conclude that the affidavit established a substantial basis for the issuance of the search warrant, and the admission of the surveillance system and surveillance video into evidence did not violate Article 1, Section 11 of the Indiana Constitution. *See Foy,* 862 N.E.2d at 1226 (determining that there was a substantial basis to conclude that probable cause existed for a search warrant where officers' and emergency medical personnel's hearsay statements in a probable cause affidavit were sufficiently trustworthy). Therefore, in the absence of a violation of the Fourth Amendment or Article 1, Section 11, we find no abuse of discretion in the trial court's admission of those exhibits into evidence.

## II. THE JURORS' EXAMINATION OF THE WEIGHTLIFTING MACHINE

Pattison argues that the trial court should not have allowed the jury to return to the courtroom during deliberations to examine the machine. Specifically, Pattison contends: (1) Pattison should have been given notice and an opportunity to be present for the jury's examination of the machine; and (2) the jurors engaged in inappropriate experiments with the machine.

■ Before we address Pattison's contentions, the State argues that Pattison waived them because he failed to timely object at trial to the jury's examination of the machine. As a general rule, the failure to object at trial results in a waiver of the issue on appeal. *Benson v. State*, 762 N.E.2d 748, 755 (Ind.2002).

In this case, at one point during the presentation of evidence, a juror asked to examine the machine. The trial court stated:

> ... I would tell you with respect to the question you had about the equipment, this equipment's gonna stay up and assembled throughout the duration of the trial and so if during deliberations you feel you want to see it, I'll clear the courtroom and you will be the only ones in here and you can check it as you desire. Just like any other evidence. Okay?

Tr. p. 523. Pattison did not object to the trial court's plan.

■ In response to the State's argument, Pattison contends that he had no objection to allowing the jurors to examine the machine during their deliberations, but he asserts that he should have been given notice and an opportunity to be present for the examination. When the trial court informed the jury that it would be given an opportunity to examine the machine during deliberations, and that the jurors would be "the only ones" in the room at that time, Pattison had an opportunity to object to his exclusion from the examination and did not take that opportunity. We conclude that he waived the issue of notice and an opportunity to be present during deliberations. However, as to Pattison's claim that the jury's examination of the machine was, in substance, an inappropriate experiment, he could not have objected to the jury's conduct before the conduct occurred. Consequently, we deem that issue to be preserved for appellate review.

■ An experiment by the jury is improper where it amounts to additional evidence supplementary to that introduced during the trial. *Bradford v. State*, 675 N.E.2d 296, 304 (Ind.1996). In *Bradford*, the defendant was charged with arson and murder. During the presentation of the evidence, a detective testified as to experiments he had conducted to establish whether the defendant could have committed the offenses in the time allowed. Next, the jury was taken to the crime scene and permitted to view it. Later, during deliberations, the jury requested and received permission to return to the crime scene, where they performed experiments as to how fast a person could pour gasoline out of a can and crawl through the house. Our Supreme Court determined that the jury's actions were in keeping with the evidence presented and were not improper. *Id.*

■ In this case, the State assembled the machine in the courtroom. The machine was entered into evidence as State's Exhibit 17 without objection. During the testimony of Laurel Jensen, who worked for the company that manufactured the machine, the jury was permitted to leave the jury box and gather around the ma-

chine. Jensen explained how it worked and pointed out its parts and features. Later, Detective Jason Page testified about experiments he had performed on the machine during his investigation. During his testimony, Page lay down on the machine and demonstrated for the jury how it functioned. Among other features, he demonstrated how a user could lock the weight bar into place on the guide bars to prevent it from falling on the user. Next, during the cross-examination of Dr. Greg Davis, the prosecutor had a detective lie on the bench, and he straddled the detective while questioning Dr. Davis. The prosecutor, while grabbing the detective's wrists, asked Dr. Davis if a person could keep another person who was using the machine from locking the weight bar into place under those circumstances. The prosecutor also asked Dr. Davis to estimate how quickly a person's breathing would be impeded if the weight bar were laying on his or her neck and another person sat on his or her abdomen.

According to a post-trial newspaper article in which one of the jurors gave an interview,[1] the jurors returned to the courtroom during their deliberations to experiment with the machine. A female juror lay on the weight bench and tried to get out from under the weight bar. Next, the same juror tried to get out from under the weights while another juror sat on her and held her wrists. As was the case in *Bradford*, the jurors in this case acted in keeping with the testimony presented at trial. Furthermore, in the current case the jurors were examining a properly admitted exhibit. We conclude that the jury's actions were not improper. *See Kennedy v. State*, 578 N.E.2d 633, 641 (Ind.1991) (finding no error where two

shirts had been admitted into evidence and two jurors of height and build similar to the defendant attempted to put them on during deliberations).

### III. DENIAL OF PATTISON'S REQUEST TO QUESTION THE JURY

■ In his motion for mistrial, Pattison asked the Court to hold a hearing and require jurors to appear for questioning about their experiments with the machine. The trial court denied Pattison's request. Granting or denying a motion for a mistrial is within the discretion of the trial court. *Treadway v. State*, 924 N.E.2d 621, 628 (Ind.2010). We review the trial court's decision solely for abuse of discretion. *Id.*

■ As a general rule, a jury's verdict may not be impeached by evidence from the jurors who returned it. *Hape v. State*, 903 N.E.2d 977, 987 (Ind.Ct.App. 2009), *trans. denied.* Parties may question jurors as to the validity of a verdict in limited circumstances, as follows:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify (1) to drug or alcohol use by any juror, (2) on the question of whether extraneous prejudicial information was improperly brought to the jury's attention or (3) whether any outside influence was improperly brought to bear upon any juror. . . .

---

1. The trial court assumed the truth of the factual representations in the article for the purpose of ruling on Pattison's motion for mistrial. We likewise assume the truth of the representations in the article for purposes of this appeal.

Ind. Evidence Rule 606(B). Pattison argues that the jurors should have been questioned to establish whether their experiments with the machine constituted extraneous prejudicial information. We have established above that the jury's examination of the machine during deliberation was not extraneous, additional evidence, but rather was a permissible consideration of the evidence presented at trial. Therefore, the trial court did not abuse its discretion by denying Pattison's request for an evidentiary hearing to question jurors. *See Hape*, 903 N.E.2d at 988 (determining that the trial court properly denied the defendant's request to question jurors about text messages the jurors found on a cell phone during deliberations because the cell phone was properly admitted into evidence, and as a result the messages were not extraneous information).

## IV. SUFFICIENCY OF THE EVIDENCE

When an appellant challenges the sufficiency of the evidence supporting a conviction, we do not reweigh the evidence or judge the credibility of the witnesses. *Joslyn v. State*, 942 N.E.2d 809, 811 (Ind.2011). We consider only the probative evidence and reasonable inferences drawn from the evidence that support the verdict. *Id.* We will affirm if the probative evidence and reasonable inferences drawn from the evidence could have allowed a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt. *Id.* A conviction may be based on circumstantial evidence alone so long as there are reasonable inferences enabling the factfinder to find the defendant guilty beyond a reasonable doubt. *Long v. State*, 935 N.E.2d 194, 198 (Ind.Ct.App.2010), *trans. denied.*

In order to convict Pattison of murder as charged, the State was required to prove beyond a reasonable doubt that (1) Pattison (2) knowingly or intentionally (3) killed (4) Lisa Pattison. *See* Ind.Code § 35–42–1–1; Appellant's App. p. 22.

In this case, ample evidence established that Pattison and Lisa's marriage was under severe stress. In 2008, Lisa discovered that Pattison had been having an affair with Stacy Henderson. Pattison stopped communicating with Henderson for several months. Nevertheless, Pattison and Henderson resumed their affair and communicated frequently by text and telephone, including during the days leading up to and following Lisa's death. On the day of Lisa's death, Pattison told a detective that he had ended the affair because he did not want to be with his mistress anymore. Nevertheless, at that time he refused to provide Henderson's name to the police. In addition, Pattison subsequently told a person from whom he purchased roofing supplies that he thought he and Henderson would be together someday. Pattison and Henderson continued to communicate even after Pattison was charged with murder and incarcerated.

Pattison filed for divorce in March 2009. At the same time, Pattison wanted to avoid the financial consequences of a divorce. On November 19, 2008, Pattison called real estate appraiser Marie Lloyd. He asked her about performing an appraisal of the marital residence, stating he "didn't know if he could afford a divorce." Tr. p. 884. Furthermore, in February 2009, a month before filing for divorce, Pattison told Lisa's friend Leah Frazier that "he wasn't going to give her 50% of his business." *Id.* at 983. A week before Lisa died, Pattison told an employee that he and Lisa were not getting along and that it was difficult to have her living there "while the divorce was being finalized." *Id.* at 906. In addition, Dillon McCoy, who was Lisa's son

and Pattison's stepson, believed that the divorce was going forward because Pattison and Lisa had put away their marriage photos and the house was up for sale. At the time of Lisa's death, Henderson also believed that Pattison intended to divorce Lisa.

Pattison told officers that on the day of Lisa's death, he came home at 11:30 a.m., entered the house at 11:45 a.m., and discovered Lisa in the exercise room. Pattison also told McCoy that he returned home between 11:30 and 11:45 a.m. However, the surveillance video showed that Pattison had returned home at 8:32 a.m. The cameras also recorded him entering and exiting the house and walking around outside of the house at 9:56 a.m., 10:03 a.m., 10:07 a.m., and 11:38 a.m. Furthermore, in the video Pattison was wearing shorts at one point and pants at another point. In addition, phone records indicate that he made several calls between 9:57 a.m. and 12:14 p.m. while at or near the house. A medical examiner, Dr. Scott Wagner, determined that Lisa had been dead for two to three hours when she was officially pronounced dead at the hospital. *Id.* at 819.

Regarding the weightlifting machine, Pattison told detectives that he and Lisa had used it "millions of times before." *Id.* at 356. McCoy only saw Lisa use the machine once, when Pattison was spotting her. McCoy stated that Lisa preferred to work out with smaller hand weights when she used the treadmill or step machine. Furthermore, when a detective told Pattison that they found that the weightlifting machine was set at 140 pounds, Pattison told him that 140 pounds "was probably about the maximum she's done." *Id.* at 398. McCoy disputed Pattison's assessment, stating "she wasn't like a woman that could bench like thirty-five pounds on each side." *Id.* at 697. Laurel Jensen inspected the machine after Lisa's death and determined that it had not seen a lot of use, judging by a lack of wear and tear. Detective Jason Page found that the machine had no mechanical failures that he could detect.

Dr. Wagner noted that Lisa's neck injury was not consistent with the weight bar falling on her neck at a high rate of speed, because her larynx, trachea, and voice box had been compressed but not crushed. To the contrary, in Dr. Wagner's opinion the weight bar could not have fallen more than "an inch or two" without resulting in far greater injuries than were actually present. *Id.* at 817. Consequently, Dr. Wagner concluded that Lisa's death was caused by asphyxiation due to compression of the weight on her neck. Dr. Wagner also noted the presence of petechiae, or ruptured blood vessels caused by pressure, on Lisa's back and concluded that they were not caused by the weight bar. Instead, the petechiae were consistent with a person straddling Lisa's torso or with a great weight being placed on her torso.

The day after Lisa's murder, Pattison asked Lisa's sister, Christine Smith, about Lisa's life insurance policy. He was "stunned" to learn that, as far as Smith knew, Lisa had recently named McCoy the sole beneficiary of her policy. *Id.* at 940. On the same day, Pattison texted Henderson and asked about Henderson's husband, stating: "So is he trying to get closer to u, since im [sic] free Now.? ? [sic] That's a sick whay [sic] to say it." Trial Notebook, Item 12, p. 3.

This circumstantial evidence is sufficient to establish beyond a reasonable doubt that Pattison killed Lisa. Pattison points to evidence that the weightlifting machine's

bench may have been inadvertently positioned so that the bar came down on Lisa's neck rather than her chest. He also contends that Lisa may have inadvertently overdosed on her prescription medications, which could have caused a cardiac problem that accidentally resulted in her death while lifting weights. These arguments amount to a request to reweigh the evidence, which we cannot do.

## CONCLUSION

For the reasons stated above, we affirm the judgment of the trial court.

Affirmed.

RILEY, J., and MAY, J., concur.