## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Aug 28 2015, 9:00 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

---

ATTORNEY FOR APPELLANT

Andrew B. Arnett
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Larry D. Allen
Deputy Attorney General
Indianapolis, Indiana

---

# IN THE
# COURT OF APPEALS OF INDIANA

---

Thomas D. Sayre,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

August 28, 2015

Court of Appeals Case No.
73A01-1412-CR-541

Appeal from the Shelby Superior Court.

The Honorable Jack A. Tandy, Judge.

Cause No. 73D01-1404-FB-028

---

**Sharpnack, Senior Judge**

# Statement of the Case

Thomas D. Sayre appeals from his conviction of two counts of sexual misconduct with a minor,[1] each as a Class B felony, contending that the evidence to support the convictions is insufficient. Sayre admitted to his status as an habitual offender. We affirm.

# Issue

The sole issue Sayre raises on appeal is whether the evidence is sufficient to support his convictions.

# Facts and Procedural History

B.J.G., who had mental health issues, was admitted to the hospital for treatment for depression. She had suffered complications from medications she had been taking. She was met at the hospital by her father and his friend, Sayre. B.J.G. was eventually transferred to Columbus Behavioral Center where adjustments to her medications allowed her to start feeling better. She was discharged from the treatment facility on February 28, 2014, a date she marked in a calendar she maintained to keep record of significant events.

Upon her release, B.J.G. returned to her grandparents' home, where she lived with her father and her siblings. She logged onto Facebook in order to search for her godfather's contact information so she could send a friend request to

---

[1] Ind. Code § 35-42-4-9(a)(1) (2007).

him. While perusing the contacts from her father's list of friends, she came across Sayre's Facebook profile and sent a friend request to him which he accepted. At that time and throughout the encounters leading to the charges against Sayre, B.J.G. was fourteen years old and Sayre was twenty-five years old.

[5] After becoming friends on Facebook, B.J.G. and Sayre had several text conversations through Facebook's messenger system. During one of the conversations, B.J.G. began the conversation by texting, "Hey, what's up handsome?" Tr. pp. 72-73. Sayre texted that he wanted to share something with B.J.G., but that he did not want to harm his relationship with her father. After B.J.G. encouraged Sayre to say what he was feeling, he told her that he "liked her a lot." Id. at 73. Sayre had known B.J.G. for much of her life and he knew that she was fourteen years old.

[6] Sayre called B.J.G. on her home telephone and told her that "if we keep it on the low, we can be together." Id. at 73-74. B.J.G. knew that his statement meant that if she did not tell anyone about her relationship with Sayre, that she would be his girlfriend.

[7] After that telephone conversation, B.J.G. and Sayre had several sexually explicit conversations, which she described as sexting, through Facebook. B.J.G. deleted the messages immediately afterwards, however, because she was afraid her father might find out about the relationship. Sayre told B.J.G. that he loved her and that he would marry her. B.J.G., whose parents were

divorced and whose grandparents were in the process of divorcing, was uplifted by Sayre's profession of love. She was lonely, the profession of love was something she deeply wanted, and the attention made her happy.

[8] On March 3, 2014, after B.J.G. exchanged messages with Sayre, she took a walk with her sister. After they returned home, B.J.G. saw a message from Sayre that read, "I seen [sic] you on your walk." *Id.* at 76. Sayre told her that he wanted to see her and that he was outside of her home. B.J.G. told her grandmother, who was home at the time, that she wanted to go outside to makes notes in her journal. She then left the house to meet Sayre behind some sheds that were on the property. B.J.G. saw Sayre appear from around her neighbor's house and walk toward her. Sayre did not have a car of his own, and B.J.G. did not know how he had arrived at her house.

[9] While the two were behind the sheds, Sayre told B.J.G that he loved her and they began kissing. During this encounter, Sayre had B.J.G. perform fellatio and submit to vaginal and anal intercourse. Sayre called B.J.G. his "dirty whore slut" and made her say his name during the incident. *Id.* at 82. The intercourse caused pain to B.J.G., so she asked him to stop. However, Sayre refused and reminded her of an earlier sexually explicit conversation during which B.J.G. had told Sayre that if she ever asked him to stop he should continue anyway. After Sayre had an orgasm, he kissed B.J.G. and began walking toward a nearby truck stop. B.J.G. memorialized the encounter on her calendar with a heart around the date and the words "Day it happened." *Id.* at 84; State's Ex. 2.

[10]   Sayre and B.J.G. continued to exchange Facebook messages in which Sayre professed his love for her. Sayre also became jealous of B.J.G., accusing her of cheating on him. In order to prove her loyalty to Sayre, B.J.G. gave him her Facebook password. Sayre began deleting messages and connections to friends from her account and used Facebook to tell others to stay away from her. At one point, Sayre posted something on B.J.G.'s Facebook wall, which B.J.G. later deleted for fear that her father might discover it. However, B.J.G.'s father had seen the post and recognized the misspellings and phrasing as Sayre's writing. B.J.G.'s father asked her about the post, but she denied any knowledge of it.

[11]   On the evening of March 6, 2014, Sayre sent a message to B.J.G. stating that he had arranged transportation and that he was coming to see her at her house. When Sayre arrived there, he knocked on B.J.G.'s bedroom window and instructed her to come outside. B.J.G. waited for approximately an hour before going outside because her grandmother was still awake when Sayre arrived. After B.J.G's grandmother was asleep, Sayre and B.J.G. met behind the sheds at approximately 2:30 a.m. on March 7, 2014. It was extremely cold outside that morning and there was ice on the ground. Sayre told B.J.G. that his trip had "better be worth it" because it was so cold. *Id.* at 90. Sayre engaged in vaginal and anal intercourse with B.J.G. during this encounter. She believed that she had to comply in order to please Sayre and prevent him from being upset with her.

[12] B.J.G. began making noises during the intercourse because of the pain involved. Sayre placed his hand over B.J.G.'s mouth and ordered her to get on top of him and "ride him." *Id.* at 91. While she complied, she scraped and bloodied her knees on the ice on the ground. Eventually, Sayre told J.G.B. that he could not achieve orgasm and that he had to leave her because his ride would be leaving soon. Sayre left B.J.G., and she noted the experience by marking her calendar.

[13] Sayre did not use a condom in either encounter with B.J.G. despite the fact that Sayre had been diagnosed with the sexually-transmitted infection, herpes, four years prior. B.J.G. testified at trial that after her sexual encounters with Sayre, it burned whenever she urinated. B.J.G. later stated that she thought that she was experiencing this symptom because Sayre had "ripped [her] vagina." *Id.* at 84-85.

[14] While at school on March 7, 2014, B.J.G. wrote a note to her friend H.R. about her encounters with Sayre. B.J.G. did not want her father to find out about the relationship, but sought H.R.'s advice. Included in the note were details regarding her sexual encounters on both occasions with Sayre, the fact that he was twenty-five years old, and that he had unique markings shaped like a star around one of his eyes. B.J.G. wrote to H.R. that she was terrified that she and Sayre would be arrested if anyone found out. Later that day, H.R. gave the note to B.J.G.'s sister while they were all still in school. B.J.G.'s sister gave the note to the school's administrators.

[15] School administrators called B.J.G.'s father and left a voicemail message for him about the contents of the note. B.J.G.'s father did not receive the message in time to meet with school officials. He picked up the note from the school the following week, on March 10, 2014. By then, B.J.G. had already told her grandmother about her sexual encounters with Sayre after being questioned about the visible injuries to her knees. G.J.G.'s grandmother was planning to move to Massachusetts on March 14, 2014.

[16] After B.J.G.'s father picked up the note from school, he was extremely upset and decided that he would deal with Sayre himself. B.J.G.'s father called Sayre and informed him that he knew what he had done with B.J.G. Prior to ending the telephone conversation, her father then told Sayre that they were going to sit down about talk about it.

[17] On March 10 and 11, 2014, Sayre continued to send messages through Facebook. On the morning of March 11, 2014, B.J.G. sent a message to Sayre noting that he had not shown up the previous night as promised and that she missed him. Sayre responded by saying, "Your dad knows." *Id.* at 107. B.J.G. asked Sayre how her father knew and asked him to deny everything. Sayre promised her that he would not give up on their relationship. Sayre then told B.J.G. that her father had somehow received B.J.G.'s "info" and for her to "just delete" the conversations. *Id.* at 108-09. Sayre told B.J.G. that he did not know how B.J.G.'s father had found out, but said, "He called and I told him I don't know anything. He said we[sic] going to sit down and talk." *Id.* at 109.

[18]   On March 14, 2014, B.J.G.'s father drove B.J.G.'s grandmother to Massachusetts. During the drive B.J.G.'s grandmother told B.J.G.'s father about what she knew of B.J.G.'s relationship with Sayre and about her observation of the injuries to B.J.G.'s knees. When he returned home, B.J.G.'s father confronted B.J.G. and asked to see her knees.

[19]   On March 31, 2014, B.J.G.'s father took her to the family doctor and made an appointment with a gynecologist to have her tested for pregnancy and for sexually-transmitted infections. B.J.G.'s father was aware of Sayre's prior diagnosis. B.J.G. tested negative for any sexually-transmitted infection, including herpes. However, B.J.G. was told to return for further testing if any lesions developed. She was told that it can take up to six months after exposure before the test shows any signs of diseases. At Sayre's trial, Shelly Snyder, a nurse, testified that unprotected sex does not always result in the transmission of herpes and may not do so when an individual, such as Sayre, has been diagnosed with herpes for several years and was receiving treatment.

[20]   B.J.G.'s father also took B.J.G. to the Shelby County Sheriff's Department to report what Sayre had done. Shelby County Detective Roger Clark interviewed B.J.G. and her father separately on April 1, 2014. Clark gathered evidence, including the last Facebook messages that B.J.G. had failed to delete.

[21]   The State charged Sayre with two counts of sexual misconduct with a minor, each as a Class B felony. The State also filed a separate count alleging that Sayre was an habitual offender. After his jury trial, Sayre was convicted of both

counts of sexual misconduct with a minor. He admitted his status as an habitual offender. The trial court sentenced Sayre to fifteen years in the Department of Correction on the first count and enhanced the sentence by twenty-five years due to Sayre's habitual offender status. Sayre received a fifteen-year sentence for his conviction on the second count of sexual misconduct with a minor to be served concurrently with his sentence for the first count. Sayre now appeals.

## Discussion and Decision

[22] Sayre contends that the evidence is insufficient to support his convictions for sexual misconduct with a minor, each as a Class B felony. When an appellant challenges the sufficiency of the evidence supporting his convictions, we do not reweigh the evidence or reassess the credibility of the witnesses. *Joslyn v. State*, 942 N.E.2d 809, 811 (Ind. 2011). We consider only the probative evidence and reasonable inferences drawn therefrom that support the verdict. *Id.* On review, we will affirm if the probative evidence and reasonable inferences drawn therefrom could have allowed a reasonable juror to find the defendant guilty beyond a reasonable doubt. *Id.* The uncorroborated testimony of one witness is sufficient to convict, even if the witness in question is the victim. *Ferrell v. State*, 565 N.E.2d 1070, 1072-73 (Ind. 1991).

[23] In order to convict Sayre of sexual misconduct with a minor as a Class B felony, the State was required to prove beyond a reasonable doubt that Sayre, a person who was at least twenty-one years of age, with B.J.G., a child who was

at least fourteen years of age but less than sixteen years of age, performed or submitted to sexual intercourse or deviate sexual conduct. Ind. Code § 35-42-4-9(a)(1). Criminal deviate conduct, as it was defined at the time of the occurrence of the offenses, means an act involving a sex organ of one person and the mouth or anus of another person, or the penetration of the sex organ or anus of a person by an object. Ind. Code § 35-31.5-2-94 (2012) (repealed by P.L. 158-2013, SEC. 366, eff. July 1, 2014).

[24] The State established that Sayre was twenty-five years old and B.J.G. was fourteen years old at the time of the offenses. B.J.G. testified that on one occasion Sayre forced her to perform fellatio and then engaged in vaginal and anal intercourse with her. She further testified that on another occasion Sayre engaged in vaginal and anal intercourse with her.

[25] The State also introduced corroborating evidence. The note written by B.J.G. to H.R. was given to school administrators, who then gave it to B.J.G.'s father, and the note was admitted in evidence. The note contains descriptions of the sexual encounters and identifies Sayre. Additionally, the note contained information about the injuries to B.J.G.'s knees, which occurred during the second sexual encounter with Sayre. B.J.G.'s grandmother and father each saw the injuries to her knees. A Facebook post to B.J.G.'s Facebook wall contained misspellings and phrasing that both B.J.G. and her father identified as Sayre's. Two pages from B.J.G.'s calendar were admitted in evidence and contained notations made by B.J.G. about the events.

Sayre claims that B.J.G.'s testimony was not probative for a jury to conclude beyond a reasonable doubt that Sayre committed the offenses. He claims this is so because B.J.G. suffered from mental health issues, there was no medical evidence to support the allegations, certain explicit Facebook conversations had been deleted, and B.J.G.'s father waited three weeks prior to contacting law enforcement.

Each of these claims are requests to reweigh the evidence and reassess the credibility of the witnesses, tasks we will not undertake on appellate review. *Joslyn*, 942 N.E.2d at 811. The evidence is sufficient to support Sayre's convictions.

## Conclusion

In light of the foregoing we affirm the trial court's judgment.

Affirmed.

Baker, J., and Najam, J., concur.