ATTORNEY FOR APPELLANT
Kimberly A. Jackson
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Curtis T. Hill, Jr.
Attorney General of Indiana

Justin F. Roebel
Andrew Kobe
Deputy Attorneys General
Indianapolis, Indiana



FILED
Feb 16 2018, 12:19 pm
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# In the
# Indiana Supreme Court

No. 28S05-1707-CR-499

SHELLY M. PHIPPS,

*Appellant (Defendant),*

v.

STATE OF INDIANA,

*Appellee (Plaintiff).*

Appeal from the Greene Superior Court, No. 28D01-1603-F6-42
The Honorable Dena A. Martin, Judge

On Petition to Transfer from the Indiana Court of Appeals, No. 28A05-1609-CR-2097

**February 16, 2018**

**Goff, Justice.**

Protective orders have sweeping reach in our state. By their terms, these orders endeavor to establish a hedge of protection around one person by restricting the actions or words of another. Thousands of faceless Hoosiers are currently subject to or shielded by protective orders like the one at the center of this case. Because violating a protective order amounts to a criminal act, the State must prove a mens rea element—that the person intended to violate the order. This case presents the question of what constitutes sufficient evidence to prove a person intentionally or knowingly violated a protective order.

## Factual and Procedural History

In 2008, a parishioner in a small Solsberry, Indiana church leveled accusations against the pastor, K.G. The parishioner, Defendant Shelly Phipps, alleged K.G. breached her confidence by revealing to other church members the personal, private information she divulged during counseling. She also alleged K.G. inappropriately hugged her on two occasions. Despite efforts from church leaders to remedy the situation and bring reconciliation, the relationship between Phipps and K.G. deteriorated. Phipps left the church and began writing to K.G. and other parishioners about her departure.

Later that year, citing repeated "harassment and emails and letters" from Phipps, K.G. sought a protective order. The court issued a protective order that included standard statutory relief, prohibiting Phipps from "harassing, annoying, telephoning, contacting, or directly or indirectly communicating with" K.G. The order mandated that Phipps stay away from K.G.'s residence and the church.

In 2009, Phipps violated the order by speaking to K.G. In April of that year, she pleaded guilty to Invasion of Privacy as a Class A misdemeanor for this violation. In that case, the trial court sentenced Phipps to 180 days incarceration with 176 days suspended to probation. In 2010, Phipps violated the protective order a second time. She pleaded guilty in March 2011 and was ordered to serve one year in the Greene County Jail with all but sixteen days suspended.

In January 2016, K.G. filed a petition to extend the original order of protection. The Greene County Superior Court granted the petition and extended the order for another two years. On February 28, 2016, Phipps emailed three elders at the church. The message reads in pertinent part:

> I originally sent this to my dad and now I am forwarding it. I'm off work Tuesday. I will give [K.G.] until Tuesday evening to comply. I have e-mailed channel 13 about doing a story. If Tuesday evening passes by then I will have him arrested for battery.

> \* \* \*

> If he puts me in jail again I will just hold a news conference from my jail cell. [K.G.] has choices: He can resign, retire, apologize or go to jail for battery. I hope he makes the right decision soon. I am more than willing to apologize for my part in this.

State's Ex. 1. Upon learning of the email from a church elder, K.G. requested that the elder forward him the message. K.G. then contacted the police. On March 3, 2016 the State charged Phipps with two counts of Invasion of Privacy: one as a Class A misdemeanor and the second as a Level 6 felony. The charging information alleged she had knowingly or intentionally violated the order "by harassing, annoying, telephoning, contacting, or directly or indirectly communicating with [K.G.]" A jury found Phipps guilty as charged. The trial court merged the two verdicts and entered a judgment of conviction for the Level 6 felony. It sentenced Phipps to two-and-one-half years with one year in work release and the remaining one-and-one-half years suspended to probation.

Phipps appealed, claiming the evidence was insufficient to support the conviction. She also argued the trial court abused its discretion by considering her criminal history as an aggravating circumstance and that her two-and-one-half-year sentence was inappropriate in light of the nature of the offense and her character. In a split opinion, the Court of Appeals majority concluded that "Phipps's email is a request to the church elders to take action for the alleged wrongful conduct of their employee, K.G. [and] [u]pon receipt of Phipps's email, the church elders had discretion to ignore her email or respond to her demands."[1] Phipps v. State, 77 N.E.3d 180, 185 (Ind. Ct. App. 2017). The majority reasoned that "Phipps did not ask the elders to share her email with K.G., and a church elder made an independent decision to forward the email to K.G." Id. Therefore, the majority "conclude[d] that Phipps's intent in sending the email was not to contact K.G., but to ask the church elders to discipline or punish K.G. for his alleged wrongful conduct." Id. Judge Pyle dissented. Singling out Phipps's testimony on cross-examination, he found the evidence sufficient for the jury to conclude that Phipps intended for her email to be communicated to K.G. Id. at 185-87 (Pyle, J., dissenting). We granted the State's petition to transfer.[2] Other facts will be included later in this opinion as necessary.

---

[1] Because the Court of Appeals found this issue to be dispositive, it declined to address her sentencing claims. We will address those later in this opinion.

[2] We summarily affirm the Court of Appeals decision in rejecting Phipps's claim that the protective order is void *ab initio*.

3

**Discussion and Decision**

Our General Assembly enacted Indiana's Civil Protection Order Act to promote the "protection and safety of all victims of domestic or family violence in a fair, prompt, and effective manner; and … prevention of future domestic and family violence." Ind. Code § 34-26-5-1 (Ind. 2017). Nationwide, "[p]rotection orders are widely used legal interventions intended to reduce the risk of future harm by one person considered to be a threat to another." Christopher T. Benitez, et al., Do Protection Orders Protect?, 38 J. AM. ACAD. OF PSYCHIATRY AND L. 376 (2010). Indiana follows this national trend. Locally, these orders average approximately seven percent of Indiana's civil court docket with over thirty thousand cases filed annually.[3] These cases spill over into criminal dockets when persons subject to protective orders violate the orders' terms. That is what happened here. Although one of thousands, this case presents an important question: what constitutes sufficient evidence to show a person subject to a protection order intentionally or knowingly violated that order?

**I.      The evidence was sufficient to affirm Phipps's invasion of privacy conviction.**

When an appeal raises "a sufficiency of evidence challenge, we do not reweigh the evidence or judge the credibility of the witnesses, and we respect a fact-finder's 'exclusive province to weigh conflicting evidence.'" Joslyn v. State, 942 N.E.2d 809, 811 (Ind. 2011) (quoting Alkhalidi v. State, 753 N.E.2d 625, 627 (Ind. 2001)). We consider only the probative evidence and the reasonable inferences that support the verdict. Tharp v. State, 942 N.E.2d 814, 816 (Ind. 2011). "We will affirm 'if the probative evidence and reasonable inferences drawn from the evidence could have allowed a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt.'" Joslyn, 942 N.E.2d at 811 (quoting Tobar v. State, 740 N.E.2d 109, 111–12 (Ind. 2000)).

To convict Phipps of invasion of privacy as a Level 6 felony, the State had to prove three elements beyond a reasonable doubt: that she (1) knowingly or intentionally; (2) violated an ex parte

---

[3] Indiana trial court statistics show new cases filed in the following years: 36,313 cases filed in 2012; 33,755 cases filed in 2013; 31,943 cases filed in 2014; 32,886 cases filed in 2015; and 35,189 cases filed in 2016. See Indiana Trial Court Statistics by County, Official Data, INDIANA SUPREME COURT, https://public.courts.in.gov/icor/ (last visited February 16, 2018). Provisional data for 2017 show 34,243 protective orders filed. See Indiana Trial Court Statistics by County, Provisional Data, INDIANA SUPREME COURT, https://public.courts.in.gov/icor/ (last visited February 16, 2018).

protective order [by harassing, annoying, telephoning, contacting, or directly or indirectly communicating with K.G.]; and (3) has a prior, unrelated conviction for invasion of privacy. I.C. § 35-46-1-15.1(2) (2014 Repl.). At oral argument, the parties agreed this case narrowly turns on the first element—intent. We, therefore, limit our review to that specific issue. The State maintains it met its burden whereas Phipps argues otherwise. Based on the evidence presented to the jury, we agree with the State.

We must begin our analysis by acknowledging that "intentionally" and "knowingly" are statutorily defined terms. "A person engages in conduct 'intentionally' if, when [s]he engages in the conduct, it is [her] conscious objective to do so." I.C. § 35-41-2-2(a) (2014 Repl.). "A person engages in conduct 'knowingly' if, when [s]he engages in the conduct, [s]he is aware of a high probability that [s]he is doing so." Id. at § 35-41-2-2(b) (2014 Repl.). These definitions reinforce our longstanding instruction that "[i]ntent is a mental function." Byassee v. State, 251 Ind. 114, 118, 239 N.E.2d 586, 588 (1968) (quoting Hanes v. State, 155 Ind. 112, 116, 57 N.E. 704, 705 (1900)). As such, a defendant's intent normally cannot be established with "mathematical precision," id. 239 N.E.2d at 588, and can rarely be proved by direct evidence, Miller v. State, 502 N.E.2d 92, 94 (Ind. 1986) (quoting Hammond v. State, 479 N.E.2d 629, 632 (Ind. Ct. App. 1985)) ("Because specific intent is a mental state not generally susceptible of direct proof, it may be inferred from all the surrounding circumstances."). Therefore, it is well-established that a defendant's intent can be proved by circumstantial evidence. McCaskill v. State, 3 N.E.3d 1047,1050 (Ind. Ct. App. 2014). For example, "[i]ntent can be inferred from a defendant's conduct and the natural and usual sequence to which such conduct logically and reasonably points." Id.

While there is no direct proof of Phipps' conscious objective here, there is ample circumstantial evidence that shows she knew she would be communicating indirectly with K.G. by emailing the church elders. First, the content of her email suggests Phipps was aware she was communicating with K.G. Although she sent the e-mail to her father and church elders, the email placed demands on K.G. only. She gave *K.G.* options in the email, "[K.G.] has choices: He can resign, retire, apologize or go to jail for battery." And for the first time, Phipps placed a deadline for *K.G.* to comply with her demands.

5

Second, although Phipps testified that she did not intend to communicate with K.G. through her email, the State pressed her on that point during cross-examination. The relevant portions of the exchange follow:

Q      Okay. You indicated on cross examination, have you got [the email] up there still?

A      Yes, yes.

Q      Okay. You indicated that you just, the intention in writing that was for you to come back to the church. Right?

A      Right.

Q      I didn't see anything in there. [K.G.] didn't see anything in there where you asked to come back to the church. Is it in there?

A      I don't believe it is in this one, no.

                              *        *        *

Q      It says in the first part that you will give [K.G.] until Tuesday evening to comply.

A      Okay, I'm not sure where you're at but.

Q      Okay, I can point it out to you.

A      Okay.

Q      I'm on the third line of the first paragraph, right there.

A      Okay.

Q      You see that?

A      I see that.

Q      How were they supposed to let [K.G.] know your demands if they didn't communicate what was in your email to him?

6

A      I wanted the elders to take care of it. I never intended for [K.G.] to get a copy of this. The elders are his boss.

Q      It says here you'll give him until Tuesday evening to comply requiring him to do something. How are they supposed to take it if it is up to him to comply? How are the elders supposed to take care of something if it is up to [K.G.] to comply?

A      This was up to the elders. This was written to the elders.

Q      Okay. Again, I'll go back. It says he can resign, retire, apologize or go to jail for battery. In order to avoid doing that he has to comply with your demands by resigning, retiring, apologizing, or going to jail.

A      All I have ever wanted was those two little words, I'm sorry, would have taken care of it.

Q      How could they get him to apologize if they don't communicate your request or demands you have?

A      It was communicated in the last hearing at the protective order.

Q      I understand that but…

A      I stated exactly…

Q      Listen, this email was sent February 28th with a very specific demand on [K.G.] Correct?

A      That is not how I take it at all.

Q      I will give [K.G.] until Tuesday evening to comply.

A      This was to [D.H.]

Q      Describe those words.

A      [E.C.], [T.K.], the elders of the church.

7

Q        Did you write those words?

A        Well, they're in the email.

Q        So did you write them?

A        I did.

Q        But yet they weren't supposed to tell him.

A        No, they are the, they call themselves the shepherds of the church.

Q        In order to get him to comply, they would have to talk to him. Right?

A        That is up to them if they talk to him.

Q        Well, how can they get him to comply if they don't talk to him, if they don't tell him what your demands are?

A        I don't know.

Q        Well, I mean think about it. You see what I'm saying?

A        I understand where you're trying to go but that was not the intent.

Q        Well, I understand you're saying that now but it's the only logical intent. It seems to me that you wanted them to talk to him. Is that right or not?

A        No, that is not right.

Q        I have no other questions.

Tr. Vol II at 155-58.

Based on these excerpts, we conclude that the jury acted within its discretion in discrediting Phipps's testimony. The jury apparently dismissed Phipps's declarations that she believed the church elders could ensure that K.G. complied with her wishes without relaying the contents of her email to

8

him. Likewise, the jury rejected Phipps's proposed alternative intent—returning to the church. On the whole, the reasonable inferences drawn from the e-mail and the State's cross-examination of Phipps support the jury's finding that Phipps intentionally or knowingly communicated with K.G. through her email to the church elders. We, therefore, will not disturb the jury's verdict. Invasion-of-privacy cases are fact specific and such determinations are best made by the finder of fact rather than a reviewing court on appeal. See Tharp, 942 N.E.2d at 816 (explaining that in an invasion-of-privacy case "the fact finder is best positioned to judge the credibility of . . . witnesses, is free to credit or discredit testimony, and weigh conflicting evidence").

**II.  The trial court did not abuse its discretion by considering Phipps's criminal history as an aggravating circumstance.**

It is axiomatic that "sentencing decisions rest within the sound discretion of the trial court and are reviewed on appeal only for an abuse of discretion." Anglemyer v. State, 868 N.E.2d 482, 490 (Ind.), clarified on reh'g, 875 N.E.2d 218 (Ind. 2007). A trial court abuses its discretion during sentencing if "the reasons given in the sentencing statement are improper as a matter of law." Kimbrough v. State, 979 N.E.2d 625, 628 (Ind. 2012) (citation omitted). For example, "[w]here a trial court's reason for imposing a sentence greater than the advisory sentence includes material elements of the offense, absent something unique about the circumstances that would justify deviating from the advisory sentence, that reason is improper as a matter of law." Gomillia v. State, 13 N.E.3d 846, 852–53 (Ind. 2014) (internal quotations and citation omitted).

Phipps claims the trial court abused its discretion in imposing the maximum sentence based on her criminal history because her prior conviction was a necessary element of the invasion of privacy charge here. According to Phipps, since her criminal history includes the two prior invasion-of-privacy convictions, it was improper as a matter of law to find that her criminal history was an aggravating circumstance.

With regard to the trial court's finding, the trial court made the following statement at the sentencing hearing:

> The aggravating circumstance is I think I have been dealing with this since I took the bench. So, I know based upon your last conviction and then this conviction it has

9

been more than 7 years but I know it has been going on with the protective orders and everything for longer than that. So, [K.G.], has been dealing with this for over 8 years. You know this isn't a one-time violation. You have got now this is your third violation for it, your third conviction. *That is an aggravating circumstance that this behavior has gone over for over 7 years, a span of 7 years.*

Tr. Vol. II at 211 (emphasis added). Although Phipps's criminal history is limited to the two prior convictions for invasion of privacy, we see from the sentencing-hearing transcript that the trial court did not find her convictions to be an aggravating circumstance. Rather, the trial court concluded that Phipps's behavior of harassing K.G., which "has gone over for over 7 years," was an aggravator. Our jurisprudence provides that Phipps's convictions cannot be used to enhance her sentence, but the particular facts—the ongoing nature and length of her criminal conduct—can properly be considered as aggravation. See, e.g., Adkins v. State, 561 N.E.2d 787, 789 (Ind. 1990) (affirming enhanced sentence for felony murder based on the nature in which the crime was committed where "the trial judge in his findings of aggravating circumstances did not use the mere fact of the shooting alone but described in detail the manner in which appellant responded when confronted by the owner of the station"); Washington v. State, 422 N.E.2d 1218, 1221 (Ind. 1981) ("The fact that the use of a weapon automatically raised the counts on confinement from class D to class B felonies does not preclude the court from also considering the manner in which the gun was used as an aggravating circumstance."). Accordingly, we conclude that the trial court did not abuse its discretion in this regard.

### III. We deny Phipps's request for 7(B) relief.

Article 7, Section 4 of the Indiana Constitution, implemented through Appellate Rule 7(B), gives this Court power to review and revise all criminal sentences. "We may revise a sentence authorized by statute, if, after due consideration of the trial court's decision, we find the sentence inappropriate in light of the nature of the offense and the character of the offender." Gibson v. State, 51 N.E.3d 204, 215 (Ind. 2016) (citing Ind. Appellate Rule 7(B)). The defendant bears the burden of persuading the Court that her sentence is inappropriate. Id.

Phipps requests that we revise her sentence, claiming the maximum two-and-one-half-year sentence she received is inappropriate given the nature of her offense and her character. Specifically,

she directs us to the record evidence showing that, under the strain of mental illness, she committed a non-violent offense that threatened only K.G.'s reputation. While these are certainly sympathetic facts, they do not represent "compelling evidence" casting Phipps's offense or character in a better light. See Stephenson v. State, 29 N.E.3d 111, 122 (Ind. 2015) (explaining that we will decline 7(B) relief absent "compelling evidence portraying in a positive light the nature of the offense . . . and the defendant's character").

Considering the nature of this offense, we note Phipps deliberately defied the protective order in place since 2009. What's more, this conviction constitutes her third violation of that order. She emailed K.G.'s superiors in an effort to force him to apologize, resign, or retire. Although Phipps's email did not portend physical violence, it threatened K.G. with job loss, jail time, and public humiliation. And as the trial court explained during sentencing, Phipps's inability to conform her behavior to court orders has resulted in a painful, protracted criminal drama for those involved, herself included. To be sure, Phipps's repeated violations have required K.G. to invoke the help of police and courts to restore order.

As to Phipps's character, we observe she has displayed admirable qualities. She achieved some college-level education and maintained a stable work history. We also note Phipps suffers from bipolar disorder, which impacts her behavior. We cannot overlook, however, that Phipps squandered prior chances at reform. Twice the trial court showed leniency and twice Phipps re-offended, carrying on the same harassing behavior. On this most recent offense, the trial court thought it appropriate to impose a two-and-one-half-year sentence but allow her to serve it on work release and probation. Since we are not convinced that Phipps's sentence proves inappropriate considering her offense and character, we will not revise it.

**Conclusion**

For the reasons discussed, we affirm Phipps's conviction and her sentence.

Rush, C.J., and David, Massa, and Slaughter, J.J., concur.