## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 27 2019, 9:28 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Michelle L. Woodward
Pittman Law Firm
Bedford, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| P.T. (minor child), by next friend, Terry Tlustek, <br><br> *Appellant-Respondent,* <br><br> v. <br><br> Ka. A.-L. (minor child) and Ki. A.-L. (minor child), by next friend Rachel Leaneagh, <br><br> *Appellees-Petitioners.* | November 27, 2019 <br><br> Court of Appeals Case No. 19A-PO-1241 <br><br> Appeal from the Lawrence Circuit Court <br><br> The Honorable Kelsey B. Hanlon, Special Judge <br><br> Trial Court Cause Nos. 47C01-1902-PO-189 47C01-1902-PO-190 |

**Kirsch, Judge.**

[1] P.T., by next friend Terry Tlustek, ("P.T.") appeals the trial court's issuance of permanent protective orders against him in two separate cases, one for Ka. A.-L. ("Ka") and one for Ki. A.-L. ("Ki"). He raises two issues, which we

consolidate and restate as whether sufficient evidence supported the trial court's issuance of the protective orders for both Ka and Ki.

[2] We affirm.

## Facts and Procedural History

[3] Sisters Ka and Ki[1] participated in a swimming program at Lawrence County Aquatics ("LCA"). *Tr. Vol. 2* at 8-9. P.T., age eleven, also participated in the program. *Id*. at 8-9, 88. Ka and Ki would attend practice at least six times per week. *Id.* at 8. Between April of 2018 and February of 2019, P.T. touched and harassed Ka and Ki. *Appellant's App. Vol. II* at 18-20 24-26. P.T. usually touched and annoyed them while all three were in the swimming pool, but on one occasion he did so when all three were at LCA but not in the pool itself.

[4] P.T. touched both Ka's and Ki's buttocks. P.T. touched Ka's buttocks two separate times. *Tr. Vol. 2* at 26, 30. Ka described the incidents as follows: "[H]e would come up behind me, and he would use his hand and brush my bottom, and then my thighs, or my thighs; then my bottom." *Id*. at 30. Ki, in turn, described the touching as follows: "[P.T.] was standing right next to me when I was doing a flip turn, and he put his hand on my butt." *Id.* at 34. When P.T. touched Ka and Ki, he often smirked at them. *Id.* at 12, 26, 34-35.

---

[1] While the record shows that Ka was born in 2004 and Ki was born in 2007, it does not divulge their dates of birth so we cannot determine their exact ages during each incident. However, it appears that that Ka was fourteen or fifteen during the incidents and that Ki was at least ten years old during the first incident and at least eleven by the time of the last incident in February of 2019. *See Appellant's App. Vol. II* at 9, 13.

[5]     P.T. would also rub his body against Ka's and Ki's bodies.  Ka described the incidents as follows:

> [H]e would come up behind me when I finally wasn't looking at him, and he would bob and brush his entire body against my back, or if I was talking to someone else, he would come up and bob his body -- he would come up and be bobbing, and his whole body would brush against my front.

*Id.* at 30-31.  Ki described similar incidents; P.T. would rub his belly against Ki's "front, my sides, and my back." *Id*. at 36, 38.  P.T. rubbed against Ki's body approximately forty times. *Id*. at 36.  This made Ki uncomfortable and scared. *Id.* at 37.  Ki was afraid of P.T. partly because he was taller than her. *Id*.  P.T. would also grab Ka's and Ki's feet. *Id*. at 12, 40.  Both Ka and Ki frequently told P.T. to not touch them. *Id*. at 13, 28, 36.  Ka told P.T six days per week to stay away from her. *Id*. at 28.

[6]     P.T. would also come very close to Ka and Ki outside the pool, particularly in a hallway just outside the pool. *Id*. at 15.  Ka and Ki would go into the hallway, put mats on the floor, and do stretching exercises. *Id*.  P.T. would follow them into the hall and place his mat between the girls' mats, such that Ka and Ki could not do their stretching exercises without touching P.T. *Id*.

[7]     P.T. would come close to Ka and Ki in other ways they found distressing, including placing his face within inches of Ka's and Ki's buttocks.  This occurred when Ka and Ki would stand on a diving block at the edge of the pool.  As they stood on the block, P.T. would position himself just behind the

block, so his face was inches from each girl's buttocks. *Id*. at 13-14; 38-39. This bothered Ka so much that each time she went to the pool, she would look for P.T.: "The first thing I would do is start scanning the pool area and making sure that he wasn't there, and that if he was, I would know exactly where he was; that way, I could be away from that area." *Id*. at 15.

[8] Some of the incidents were unique to each girl. As to Ka, P.T. would rub his hand down the full length of Ka's back, lift his hand to avoid Ka's buttocks, and then run his hand down Ka's thighs. *Id*. at 11. P.T. would sometimes corner Ka in the pool, and while doing so, brush his hand against Ka's arm or bump her with his legs. *Id*. at 12-13.

[9] In a January 14, 2019 incident, while Ka was swimming laps, P.T. brushed his side against Ka's side, which made her "super uncomfortable." *Id*. at 16. When Ka was stationary against the pool wall, P.T. approached Ka and pressed against her. *Id*. Ka told P.T. to stop, but he said that "he had no choice, he couldn't help it." *Id*. Ka used her elbows to push P.T. away "because it was really making me very uncomfortable." *Id*. During this incident, P.T. touched Ka at least thirty times. *Id*. at 16-17. All these incidents made Ka stressed and anxious. *Id*. at 20-21.

[10] As to Ki, P.T. massaged her ear, which made Ki uncomfortable and nervous. *Id*. at 37. On another occasion, Ki was playing cards with friends while sitting on the pool's bleachers, P.T. and his sisters approached the group, and P.T. started "stomping around us, jumping off one part of the bleacher to another,

being really loud," which made Ki uncomfortable. *Id*. at 40. As P.T. was introducing his sisters to Ki and her friends, P.T. thrust his finger close to Ki's face, which made her uncomfortable. *Id*. On another occasion, P.T. spit a mouthful of water into Ki's face. *Id*. at 39.

[11] While P.T. claimed that some of the incidents were accidental, he admitted that some were intentional. *Id.* at 90. He also admitted that Ka and Ki often told him not to touch them. *Id*. In fact, he admitted that Ka told him once or twice per day not to touch her. *Id*. He also admitted to putting his face near each girl's buttocks. *Id*. at 91.

[12] On February 14, 2019, Rachel Leaneagh, Ka and Ki's mother, filed two petitions for a protective order, one for Ka under cause number 47C01-1902-PO-189 and one for Ki under cause number 47C01-1902-PO-190. *Appellant's App. Vol. II* at 17-22, 23-29. Each petition alleged that P.T. had committed a sex offense or stalking. *Id*. at 17, 23. Ka's petition listed incidents occurring between April of 2018 and February of 2019, claiming that P.T. touched her buttocks and thighs, placed his hand near her groin, rubbed his body against her, grabbed her feet, placed his face near her buttocks, ran his hand down her back, breathed heavily while standing next to her, pointed his finger close to her face, and stomped and yelled next to her as she tried to play cards with her friends. *Id*. at 19-20. In her petition, Ki made allegations about similar incidents occurring during the same period. *Id*. at 24-26. Ki also alleged that P.T. touched her and bothered her in different ways; she claimed P.T. massaged

her ear, spit water in her face, and pointed his finger close to her face and yelled, "I'm not touching you! I'm not touching you!" *Id.* at 25.

[13] On February 15, 2019, the trial court issued a temporary, ex parte order under each cause number, finding that both Ka and Ki proved by a preponderance of the evidence that P.T had committed a sex offense against each one of them; P.T. represented a credible threat, justifying the entry of temporary protective orders; P.T. should be enjoined from committing a sex offense against Ka and Ki; P.T. should be prohibited from harassing, annoying, telephoning, contacting, or directly or indirectly communicating with Ka and Ki; and P.T. should be ordered to stay away from the girls' home and school. *Id.* at 35, 38.

[14] On March 28, 2019, the trial court conducted a hearing regarding whether to make the temporary protective orders permanent. *Tr. Vol. 2* at 2. As the hearing began, the trial court consolidated the cases. *Id.* at 5. At the end of the hearing, the trial court stated that the temporary, ex parte orders would "remain in effect until the court issues its final order[s]." *Id.* at 92.

[15] On May 8, 2019, the trial court issued orders under each cause number, making identical findings and issuing identical orders, finding that both Ka and Ki had shown, by a preponderance of the evidence, that P.T. had stalked them and that this justified making the temporary protective orders permanent orders. *Appellant's App. Vol. II* at 10-12, 14-16. The trial court enjoined P.T. from stalking Ka and Ki and from harassing, annoying, telephoning, contacting, or directly or indirectly communicating with Ka and Ki. *Id.* at 10, 14. The trial

court did allow P.T. to be at the same locations and events as Ka and Ki, but it ruled that P.T. must stay away from Ka and Ki by at least twenty-five feet. *Id.* at 11, 15. P.T. now appeals. We will supply additional facts as necessary.

## Discussion and Decision

[16] P.T. argues that the permanent restraining orders were not supported by sufficient evidence because both Ka and Ki failed to prove by a preponderance of evidence that P.T. stalked each of them.[2]

[17] We initially observe that Ka and Ki did not file an appellee's brief, either individually or collectively. Where an appellee fails to file a brief, we do not develop arguments on that party's behalf; rather, we may reverse upon a prima-facie showing of reversible error. *Morton v. Ivacic,* 898 N.E.2d 1196, 1199 (Ind. 2008). Nevertheless, we are obligated to correctly apply the law to the facts to determine whether reversal is required. *Geico Ins. Co. v. Graham,* 14 N.E.3d 854, 857 (Ind. Ct. App. 2014).

[18] To obtain an order of protection under the Civil Protection Order Act, the petitioner must prove the allegations by a preponderance of the evidence. Ind.

---

[2] P.T. also argues at length that the temporary restraining orders, issued because the trial court found that P.T. committed sex offenses against Ka and Ki, were not supported by sufficient evidence. However, the propriety of those orders is moot because the permanent protective orders superseded those temporary orders. *See Nordman v. N. Manchester Foundry, Inc.*, 810 N.E.2d 1071, 1073 n.2 (Ind. Ct. App. 2004) (appellant's argument that entry of temporary restraining order was erroneous was moot because the trial court entered a permanent injunction, which was final judgment and thus superseded the temporary restraining order.).

Code § 34-26-5-9(f). We will not reweigh the evidence or judge the credibility of the witnesses. *A.S. v. T.H.*, 920 N.E.2d 803, 806 (Ind. Ct. App. 2010). A parent may file a petition for protective order on behalf of a child if a person has committed stalking under Indiana Code section 35-45-10-5. Ind. Code § 34-26-5-2(b). A person who stalks another person commits stalking, a Level 6 felony." Ind. Code § 35-45-10-5(a). "Stalking" refers to a "knowing or an intentional course of conduct involving repeated or continuing harassment of another person that would cause a reasonable person to feel terrorized, frightened, intimidated, or threatened and that actually causes the victim to feel terrorized, frightened, intimidated, or threatened." Ind. Code § 35-45-10-1. "However, there is no requirement that the contact at issue be threatening on its face, and stalking may be found where other evidence is sufficient to prove that the contact amounted to harassment." *Maurer v. Cobb-Maurer*, 994 N.E.2d 753, 757-58 (Ind. Ct. App. 2013). "Harassment" is conduct "directed toward a victim that includes but is not limited to repeated or continuing impermissible contact that would cause a reasonable person to suffer emotional distress and that actually causes the victim to suffer emotional distress." Ind. Code § 35-45-10-2.

[19] We have found sufficient evidence for a stalking conviction where after the victim declined the defendant's lunch invitations, the defendant continued to send the victim flowers and notes and to telephone the victim, even after she demanded that he stop. *See Garza v. State*, 736 N.E.2d 323, 325 (Ind. Ct. App. 2000). We also found sufficient evidence for a stalking conviction where a

person followed a woman as she shopped from store to store and videotaped her shopping activities, which made her feel terrorized, frightened, intimidated, or threatened. *Sandleben v. State*, 29 N.E.3d 126, 131-32 (Ind. Ct. App. 2015).

[20] Here, P.T. contends that the evidence for stalking was insufficient because Ka and Ki failed to prove that P.T.'s actions terrorized, frightened, intimidated, or threatened both girls and that P.T.'s actions would not have that impact on a reasonable person. In support, P.T. cites evidence that does not support the judgment. For instance, he mentions the testimony of Tina Howell ("Howell"), the safety coordinator at LCA, who investigated the incidents and concluded that P.T. was not bullying Ka and Ki and did not pose a threat to either girl. *Tr. Vol. 2* at 59-66. Howell characterized P.T.'s touching of Ka and Ki as a mere annoyance. *Id*. at 66.

[21] We reject P.T.'s request to reweigh the evidence and find that the evidence sufficiently established that P.T. stalked both Ka and Ki; that is, the evidence showed that P.T. knowingly or an intentionally engaged in a repeated course of conduct that would cause a reasonable person to feel terrorized, frightened, intimidated, or threatened and that actually caused Ka and Ki to feel terrorized, frightened, intimidated, or threatened. *See* Ind. Code § 35-45-10-1. We first observe that the intentional nature of P.T.'s conduct may be inferred from the conduct itself. *Phipps v. State*, 90 N.E.3d 1190, 1195-96 (Ind. 2018) ("[I]ntent can be inferred from a defendant's conduct and the natural and usual sequence to which such conduct logically and reasonably points."). Here, P.T. touched the girls innumerable times even though they often told him to stop. *Tr. Vol. 2*

at 12-17, 21, 28, 30, 34, 36-38, 40. P.T. even admitted that his behavior was intentional. *Id*. at 90. It was also reasonable to infer that P.T.'s non-touching behavior was intentional. *See Phipps*, 90 N.E.3d at 1095-96. Indeed, this is the only possible inference to be made from P.T. approaching Ka and Ki from behind when they were on the diving board and placing his face within inches of their buttocks. *Tr. Vol 2* at 13-15, 37-38. Underscoring the intentional nature of P.T.'s conduct was that after he touched or bothered Ka or Ki, he often smirked at them. *Id*. at 12, 26, 34-35.

[22] The evidence also sufficiently established that P.T.'s behavior frightened, intimidated, or threatened Ka and Ki. *See* Ind. Code § 35-34-10-1. Ka testified that she felt "super uncomfortable" when P.T. swam by her and brushed his body against her side. *Id*. at 16. She also testified:

> I would stress out before and after practice, because, before practice I would be stressing; thinking, oh, my goodness, I hope he's not there, I hope he's not gonna' touch me, and then after practice, I -- if he had touched me, or came super close to me or something, then I would get stressed out and start feeling anxious, and be talking to my mom about it, which I'm glad she was there for me the whole time. And, it was just so stressful until the protective order was put up, and then I felt like I could finally relax, until the past week.

*Id*. at 21.

[23] P.T. rubbed against Ki's body approximately forty times. *Id*. at 36. This made Ki uncomfortable and scared. *Id.* at 38. Ki testified that P.T. frightened her partly because he was taller than her. *Id*. at 37. Ki felt uncomfortable and

nervous when P.T. massaged her ear, and she also felt uncomfortable when P.T. stomped and yelled and thrust his finger close to her face. *Id.*

[24] Moreover, it was reasonable for Ka and Ki to feel frightened, intimidated, or threatened by P.T.'s behavior. *See* Ind. Code § 35-34-10-1. Even though Ka and Ki warned P.T. countless times to stop touching and harassing them, P.T. stubbornly persisted in his inappropriate behavior. For young girls like Ka and Ki, it was reasonable to experience fear and intimidation from P.T.'s constant groping and his boorish yelling and stomping. P.T.'s effort to categorize his behavior as merely "annoying" ignores the gravity of his behavior and asks us to reject the reasonable inferences to be drawn from his behavior and its likely emotional impact on vulnerable young girls. Thus, sufficient evidence supported the issuance of permanent protective orders against P.T. and in favor of both Ka and Ki on the grounds that P.T. stalked each one of them.

[25] Affirmed.

Baker, J., and Crone, J., concur.