## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 12 2020, 8:52 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Christopher Kunz
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

George P. Sherman
Supervising Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Chanda Harris,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

August 12, 2020

Court of Appeals Case No.
19A-CR-2580

Appeal from the Marion Superior Court

The Honorable Barbara Crawford, Judge
The Honorable Amy J. Barbar, Magistrate

Trial Court Cause No.
49G01-1805-F6-14711

**Darden, Senior Judge.**

# Statement of the Case

Chanda Harris appeals her three convictions of neglect of a dependent, all as Level 6 felonies.[1] We affirm.

# Issues

Chanda Harris raises three issues, which we restate as:

    I.      Whether the evidence is sufficient to sustain Harris' convictions.

    II.      Whether the trial court erred in excluding from evidence three photographs submitted by Harris.

    III.    Whether the trial court committed fundamental error while instructing the jury.

# Facts and Procedural History

In 2015, Harris contacted Donald Campbell, stating she believed that she was his biological daughter. After paternity testing confirmed that he was her biological father, Donald and his wife, Denise Campbell, regularly communicated with Harris. At that time, the Campbells lived in Lake County, Indiana. Harris and her three children, seven-year-old I.V., five-year-old P.V., and three-year-old H.H., all lived in a house in Indianapolis with Harris' then-boyfriend, Robert Kuner. The house had previously belonged to Kuner's

---

[1] Ind. Code § 35-46-1-4(a)(1) (2014).

grandparents, but no one had lived there for twenty years before Kuner, Harris and the children moved in during March 2015. The house had primarily been used for storage purposes. Kuner's parents lived next door.

[4] In late 2015, Donald traveled to Harris' house, planning to stay over-night before he and Harris were to leave for a trip to Kentucky. When he arrived, he saw that the house was in an "extremely run down" and cluttered condition. Tr. Vol. II, p. 69. Specifically, the ceiling in the kitchen had been ripped away exposing wiring, joists and roof. The living room ceiling had a long crack in it with signs of water damage, and a portion of the dining room walls and ceiling had also been torn open. In addition, there was "black mold throughout the house in several areas." *Id.* at 75. The house was also cold inside.

[5] In the main bathroom, the toilet, bathtub, and sink were rusty and moldy. Donald saw a new toilet in the house, but it had not been installed. The children's bedrooms were also very cluttered, as was the garage. There was an upstairs bathroom, but it "was inoperable." *Id.* at 82.

[6] Donald testified that he visited the house at least four or five additional times over the next two years. Each time he visited he continued to see the same run-down conditions, clutter and defects in the house that he had observed during his first visit, however, it appeared to him that the rooms had become even more cluttered. In addition, Harris and Kuner bred dogs in one room of the house, and Donald regularly saw dog feces in the breezeway that connected the house and the garage. The strong odor of feces could be smelled throughout the

house. At some point in 2017, there was no running water, the water had stopped draining in the bathroom, and Kuner, Harris, and the children had to go to Kuner's parents' house to bathe and/or use the restroom. Donald had purchased supplies to help them renovate the house, but the supplies were never used. The new toilet was never installed. During the ensuing period, Donald had expressed to Harris his concerns for the children's health and welfare due to what he perceived to be unsafe conditions and extreme clutter in the house. Finally, in December, 2017, Donald helped Harris and her children move out of the house.

[7] Meanwhile, in April 2016, the Campbells had visited Kuner's parents' house for a family gathering after a memorial service in honor of Kuner's father. Denise entered Harris' home to use the restroom. She saw broken glass in the breezeway entrance to the house. In the bathroom, she saw that the bathtub, the toilet, and the sink were "thick in rust and mildew and mold." *Id.* at 61. She smelled strong odors of "urine and mold and mildew." *Id.* at 58.

[8] Apparently, either in late 2017 or early 2018, an investigation was conducted concerning the living conditions of the children. Detective Jonathan Schultz of the Indianapolis Metropolitan Police Department was assigned to investigate the interior conditions in the house. During his investigation, Harris told Detective Schultz that they had used space heaters to heat the house because the heating system was broken. She further stated that there was a hole in the ceiling, and that "water wouldn't drain" out of the plumbing in the house. *Id.* at 88. In addition, Harris told Detective Schultz that she and the children had

to go over to Kuner's mother's home to "stay warm" during the wintertime. *Id.* at 91.

[9] When Detective Schultz had inspected the house on March 4, 2018, he observed that there was still a hole in the ceiling, there was clutter and dog feces throughout the house, and it was very cold inside. He took numerous photographs. Donald later stated and testified that the photographs accurately depicted the interior of the house during the times when he had visited, except that the rooms were more cluttered during his visits.

[10] On March 7, 2018, the State charged Harris with three counts of neglect of a dependent, all Level 6 felonies. Harris' counsel entered an appearance two days later. The trial court held an initial hearing for May 10, 2018, during which the trial court set an omnibus date of July 5, 2018.

[11] The trial court presided over a jury trial on August 14, 2019. At the beginning of the trial, before the potential jurors were brought into the courtroom, the State raised an objection to Harris' proposed introduction of Exhibits A, B, and C, which were photographs. Two of the photographs depicted the children in the house, and the third picture depicted a Christmas tree and presents in the corner of a room in the house. The State argued that Harris had not disclosed the photographs until the day before trial, i.e., less than 24 hours of trial. Neither the State nor Harris requested a continuance of the trial, and the trial court did not offer one. After the parties presented argument, the trial court excluded the photographs from evidence.

[12]    The jury found Harris guilty as charged.  Subsequently, the trial court imposed a sentence, and this appeal followed.

# Discussion and Decision

## I. Sufficiency of the Evidence

[13]    Harris argues that her convictions should be reversed because the State failed to prove the conditions in the house were dangerous, or that she was aware of any danger.  When a defendant challenges the sufficiency of the evidence, we neither reweigh evidence nor judge witness credibility.  *McCallister v. State*, 91 N.E.3d 554, 558 (Ind. 2018).  We instead consider only the probative evidence and the reasonable inferences that support the verdict.  *Phipps v. State*, 90 N.E.3d 1190, 1195 (Ind. 2018).  We will affirm the conviction if probative evidence supports each element of the crime beyond a reasonable doubt.  *Brantley v. State*, 91 N.E.3d 566, 570 (Ind. 2018), *cert. denied*, 139 S. Ct. 839, 202 L. Ed. 2d 609 (2019).

[14]    To obtain convictions on the three counts of neglect of a dependent, all as Level 6 felonies, the State was required to prove beyond a reasonable doubt that Harris:  (1) had the care of dependents I.V., P.V., and H.H.; and (2) knowingly or intentionally (3) placed them in a situation that endangered their lives or health.  Ind. Code § 35-46-1-4(a)(1).  Harris does not dispute that I.V., P.V., and H.H. were dependents in her care.  We instead address the elements of endangerment and Harris' mental state.

[15] The purpose of Indiana Code section 35-46-1-4 "is to authorize the intervention of the police power to prevent harmful consequences and injury to dependents." *State v. Downey*, 476 N.E.2d 121, 123 (Ind. 1985). The danger referred to in the statute must be "actual and appreciable." *Id.* However, actual physical injury is not required to obtain a conviction. *Williams v. State*, 829 N.E.2d 198, 201 (Ind. Ct. App. 2005), *trans. denied*.

[16] Here, there is ample evidence that the deteriorated condition of Harris' house posed an actual and appreciable risk of harm and danger to her three children. She admitted to Detective Schultz that the home's heating system did not work and that she had to use space heaters to keep the children warm. Harris argues that the house was without heat for only a few months before she and the children moved out, and that she had the children sleep at Kuner's mother's house on only one cold night, but her argument is nothing more than a request to reweigh the evidence. Donald testified that the house was "cold" even during his first visit in late 2015, indicating that the problem was more long-lasting. Tr. Vol. II, p. 69.

[17] In addition, the house lacked running water for several months, requiring the children to go next door for showers and to use the restroom. Even when the house had running water, the only functioning bathtub, sink, and toilet in the house were covered in mold, rust, and mildew. Further, the ceiling and drywall had been removed in several places, revealing water damage and additional mold. According to the testimony of Donald and Denise, the entire house had a terrible stench of urine, mold, mildew, and dog feces when they visited.

[18] Finally, the house had been used primarily for storage purposes before Harris and the children moved in and it continued to be cluttered with Kuner's family's belongings throughout the time they stayed there, including the children's bedrooms. This is ample evidence of actual and appreciable risks of danger to the children's health, including their mental health. *See Germaine v. State*, 718 N.E.2d 1125, 1132 (Ind. Ct. App. 1999) (ample evidence supported conviction of neglect of a dependent; parent had allowed garbage to clutter the house, posing a risk of fire and disease), *trans. denied*.

[19] We next turn to Harris' claim that the evidence does not show that she acted "knowingly," as set forth in the governing statute. Proof of a defendant's mental state is "almost inevitably, absent a defendant's confession or admission, a matter of circumstantial proof." *Bowser v. State*, 984 N.E.2d 236, 240 (Ind. Ct. App. 2013). We may infer the required mental state "from the facts and circumstances of each case." *Baxter v. State*, 891 N.E.2d 110, 121 (Ind. Ct. App. 2008). For purposes of the offense of neglect of a dependent, a defendant acts "knowingly" when the defendant is "subjectively aware of a high probability that [he or she] placed the dependent in a dangerous situation." *Ware v. State*, 441 N.E.2d 20, 23 (Ind. Ct. App. 1982).

[20] In this case, the children ranged in age from seven to three in 2015, and were completely dependent upon Harris to keep them safe throughout the two-year period that they lived in the house. The children's bedrooms, and many other rooms, were filled with clutter. The house had obvious safety issues, including water-damaged ceilings, mold, damaged drywall, and a broken heating system.

The one functional bathroom contained mold, mildew, and rust, and even that bathroom ceased to be usable after the drainpipe quit working. Harris admitted to Detective Schultz that the condition of the house was not "good," conceding that there was a hole in the ceiling, the heating system was broken, and water did not drain out of the house. Donald testified that the poor conditions never changed for the better during the multiple visits they made to the house over a two year period. This is ample evidence from which the jury could have determined beyond a reasonable doubt that Harris was subjectively aware that she had placed the children in a home that posed a danger to their health for several years. *Cf. Scruggs v. State*, 883 N.E.2d 189, 190 (Ind. Ct. App. 2008) (insufficient evidence of Scruggs' mental state to support a conviction of neglect of a dependent; Scruggs left her seven-year-old child alone at home for three hours). There is sufficient evidence to sustain Harris' conviction.

## II. Exclusion of Belatedly Disclosed Photographs

[21] Harris argues the trial court erred in excluding from evidence her Exhibits A, B, and C, consisting of three photographs. "A trial judge has the responsibility to direct the trial in a manner that facilitates the ascertainment of truth, ensures fairness, and obtains economy of time and effort commensurate with the rights of society and the criminal defendant." *Vanway v. State*, 541 N.E.2d 523, 526 (Ind. 1989). "The trial court must be given wide discretionary latitude in discovery matters since it has the duty to promote the discovery of truth and to guide and control the proceedings, and will be granted deference in assessing what constitutes substantial compliance with discovery orders." *Id.* at 527. A

trial court's ruling on the admissibility of evidence constitutes an abuse of discretion only if the ruling is clearly against the logic and effect of the facts and circumstances before it, or if the trial court has misinterpreted the law. *Hastings v. State*, 58 N.E.3d 919, 922 (Ind. Ct. App. 2016).

[22] Sanctions for failure to comply with discovery deadlines are within the trial court's discretion, but when deciding whether to exclude evidence, the primary factors that a trial court should consider are "whether the breach was intentional or in bad faith and whether substantial prejudice has resulted." *Wiseheart v. State*, 491 N.E.2d 985, 988 (Ind. 1986). "[I]t is necessary that the trial court determine more than the existence of a violation," *id.* at 988, because exclusion of evidence is an "extreme sanction." *Id.* at 991. In general, a continuance of the trial, rather than exclusion of evidence, is the appropriate remedy for belatedly disclosed evidence. *Cook v. State*, 675 N.E.2d 687, 691 (Ind. 1996).

[23] Marion Superior Court Criminal Rule 107(1)(c) provides: "All Discovery shall be completed by the omnibus date unless extended for good cause shown." In Harris' case, the trial court set an omnibus date of July 5, 2018. Neither party requested an extension of the discovery deadline. Harris' belated disclosure of the three photographs on August 13, 2019, less than 24 hours of the day before the trial, thus violated the local rule. The question is whether there was bad faith or substantial prejudice, above and beyond the rule violation, to justify the extreme sanction of exclusion of evidence.

[24] The State did not allege at trial, and does not allege on appeal, that Harris acted in bad faith. As a result, our analysis focuses on whether the State was substantially prejudiced by the belated disclosure. There is no dispute that Harris failed to disclose the photographs to the prosecutor until the day before trial. Thus, the State was caught completely unawares. *Cf. Cook*, 675 N.E.2d at 691 (trial court erred in excluding Cook's witness; although Cook failed to timely disclose the witness to the State, the State had named the witness in its own discovery materials and was aware of the substance of her testimony well in advance of trial). Further review of the record reveals that Harris had been granted at least 5 continuances of the trial dates from 2018 to 2019.

[25] Further, the State submitted ample evidence that it would be substantially prejudiced by the admission of the belatedly disclosed evidence at trial, or by a continuance. First, two of its witnesses, the Campbells, had traveled to Indianapolis from Lake County the day before to testify, incurring traveling and lodging expenses.

[26] Second, the State was deprived of an opportunity to timely investigate the circumstances under which the photographs were taken, including what cleaning may have been done prior to taking the photographs. These circumstances could have been crucial to the State in attempting to challenge the value of the photographs during trial.

[27] Third, two of Harris' photographs, specifically Exhibits A and B, depicted the child-victims, with smiles on their faces. The prosecutor informed the trial

court that she had not intended to have the children testify at trial because they had been diagnosed with "PTSD as a result of what they've been through." Tr. Vol. II, p. 4. The prosecutor further stated that, under the circumstances, after advance notice to defense and taking into consideration the health and welfare of the children, Harris' counsel knew the State had not intended to call the children to testify. But because the children were depicted in two of the photographs, the prosecutor may be forced to call the children to testify "against their mom." *Id.* As a result of the late notice by the defense, the State would be obligated to bring the children to court and hurriedly attempt to prepare them for a possibly traumatizing experience.

[28] Under these facts and circumstances, herein, the State demonstrated that it would have been substantially prejudiced by the belatedly disclosed photographs being admitted into evidence. The trial court did not abuse its discretion in excluding them.

[29] Even if the trial court erred in excluding Harris' photographs from evidence, any error was harmless. When evidence is erroneously excluded, reversal is required only if the error relates to a material matter or substantially affects the rights of the parties. *Hill v. State*, 51 N.E.3d 446, 450 (Ind. Ct. App. 2016). In determining whether an error is harmless, we must assess the probable impact of that evidence upon the jury. *Id.* (quotation omitted).

[30] In the instant case, testimony from the Campbells, testimony and photographs from Detective Schultz, and Harris' admissions to Detective Schultz strongly

support the State's charges of neglect of a dependent. By contrast, Harris' three photographs provide only limited information about the house. Two of the three photographs focus upon the children rather than the entirety of the rooms. The third photograph shows a Christmas tree and presents placed in the small corner of a room. None of the photographs show the damaged walls or ceilings, or the decrepit, filthy bathroom or the conditions of the entire house. Considering all the evidence presented at trial, if the photographs had been presented to the jury, their probable impact would have been minimal if any. *See Townsend v. State*, 26 N.E.3d 619, 629 (Ind. Ct. App. 2015) (trial court's error in excluding testimony from Townsend's witness was harmless considering the other evidence submitted at trial), *trans. denied*. We conclude the trial court did not abuse its discretion in excluding the photographs from evidence.

## III. Jury Instructions and Fundamental Error

[31] Harris argues the trial court should have instructed the jurors that they were required to unanimously agree as to which of her acts endangered the children. In general, the manner of instructing a jury is left to the sound discretion of the trial court. *Albores v. State*, 987 N.E.2d 98, 99 (Ind. Ct. App. 2013), *trans. denied*. We review the trial court's decision only for an abuse of that discretion. *Id.*

[32] Harris concedes that she did not object to the omission of an unanimity instruction from the trial court's jury instructions. When a defendant fails to preserve an alleged instructional defect, the objection is waived, and reversal is

warranted only in instances of fundamental error. *Pattison v. State*, 54 N.E.3d 361, 365 (Ind. 2016). Fundamental error is error that represents a blatant violation of basic principles rendering the trial unfair to the defendant, thereby depriving the defendant of fundamental due process. *Evans v. State*, 81 N.E.3d 634, 637 (Ind. Ct. App 2017). The error must be so prejudicial to the rights of the defendant as to make a fair trial impossible. *Id.*

[33] Harris claims that during trial, the State "proposed a variety of options" as to how she committed three counts of neglect of a dependent, Appellant's Br. p. 10, and in the absence of a jury instruction requiring the jury to unanimously agree which set of facts constituted neglect of a dependent, the jurors could have inappropriately "reached six different verdicts" as to which acts endangered each of the three children. *Id.* at 25.

[34] The leading Indiana Supreme Court decision on unanimity in jury verdicts is *Baker v. State*, 948 N.E.2d 1169 (Ind. 2011). In that case, Baker was charged with three counts of child molesting involving three different relatives. At trial, each of the three victims testified that Baker had molested them on multiple occasions. A jury determined he was guilty as charged. On appeal, Baker argued the trial court should have instructed the jury that they needed to unanimously agree as to the specific circumstances under which Baker had committed each offense. Baker had not presented that argument to the trial court, so the Indiana Supreme Court reviewed his claim for fundamental error.

[35]     Our Supreme Court noted that the State may allege alternative theories of culpability when prosecuting a defendant for a single offense, but problems arise when "evidence is presented of a greater number of separate criminal offenses than the defendant is charged with." *Id.* at 1175. As a result, the Court determined:

> [T]he State may in its discretion designate a specific act (or acts) on which it relies to prove a particular charge. However if the State decides not to so designate, then the jurors should be instructed that in order to convict the defendant they must either unanimously agree that the defendant committed the same act or acts or that the defendant committed all of the acts described by the victim and included within the time period charged.

*Id.* at 1177. The *Baker* Court further noted the trial court did not provide an unanimity instruction to the jury. However, any error in failing to provide the instruction was not fundamental because Baker's sole defense was a challenge to the victims' credibility, and by resolving the credibility dispute against Baker, the jury would have convicted him of any of the offenses that had been shown by the evidence to have been committed.

[36]     In the instant case, the State alleged that Harris had committed each offense between March 1, 2015 and December 14, 2017. There is no dispute that the prosecutor failed to specify for the jury the acts or omissions by Harris that amounted to the three offenses of neglect of a dependent. There is also no dispute that the trial court's jury instructions merely told the jurors that they

must "agree" to a verdict and should not sign a verdict form unless they had reached a "unanimous" decision. Appellant's App. Vol. II, pp. 160-61.

[37] In any event, even if the trial court was required to give an unanimity instruction according to the holding in *Baker*, we conclude any error was not fundamental. As in *Baker*, the key dispute in this case was witness credibility. Harris testified in her own defense, and she challenged the version of events put forth by the State's witnesses. She stated that she had cleaned up the clutter in the children's rooms upon moving in. Harris also disputed that there was lots of clutter in the house, and she further stated that there were no more than three dogs in the house when she lived there. In addition, she claimed that she repeatedly attempted to clean the only functioning bathroom, but that it was stained from well water. Finally, she testified that Kuner let the house deteriorate after his father died, and the worst problems arose only after she and the children had moved out. Having staked her defense on credibility determinations, we conclude, as the *Baker* Court did, that once the jury determined the credibility question against Harris, the jury would have convicted her of any of the theories raised by the State. Harris has failed to establish that the absence of an unanimity instruction was so prejudicial as to render a fair trial impossible.

## Conclusion

[38] For the reasons stated above, we affirm the judgment of the trial court.

[39] Affirmed.

[40] Riley, J., and Crone, J., concur.