

ATTORNEY FOR APPELLANT

Stanley L. Campbell
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Josiah Swinney
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Mitchell Vanryn,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | September 30, 2020<br><br>Court of Appeals Case No.<br>19A-CR-1354<br><br>Appeal from the Allen Superior<br>Court<br><br>The Honorable Frances C. Gull,<br>Judge<br><br>Trial Court Cause No.<br>02D05-1712-MR-11 |

**Pyle, Judge.**

# Statement of the Case

Mitchell Vanryn ("Vanryn") appeals his conviction by jury of Level 1 felony aggravated battery[1] and Level 2 felony domestic battery[2] following the death of his girlfriend's ("Mother") two-year-old son. He also appeals the aggregate forty (40) year sentence imposed thereon. He argues that: (1) the trial court abused its discretion in admitting evidence; (2) the trial court abused its discretion in instructing the jury; (3) there is insufficient evidence to support his conviction for Level 1 felony aggravated battery; and (4) his sentence is inappropriate in light of the nature of the offenses and the character of the offender. Concluding that: (1) the trial court did not abuse its discretion in admitting evidence; (2) the trial court did not abuse its discretion in instructing the jury; (3) there is sufficient evidence to support Vanryn's Level 1 felony aggravated battery conviction; and (4) Vanryn's sentence is not inappropriate, we affirm Vanryn's convictions and sentence.

We affirm.

# Issues

1.   Whether the trial court abused its discretion in admitting evidence.

---

[1] IND. CODE § 35-42-2-1.5.

[2] I.C. § 35-42-2-1.3.

2.    Whether the trial court abused its discretion in instructing the jury.

3.    Whether there is sufficient evidence to support Vanryn's conviction for Level 1 felony aggravated battery.

4.    Whether Vanryn's forty (40) year sentence is inappropriate.

## Facts

[1] The facts most favorable to the verdict reveal that Mother is the parent of daughter, K.H. ("K.H."), who was born in 2011, and son, M.G. ("M.G."), who was born in February 2015 and who was the victim in this case. Mother began dating twenty-seven-year-old Vanryn in January 2017, and Vanryn moved into Mother's house in June 2017. Vanryn, had a three-year-old son, J.V. ("J.V."), who spent the majority of his time with Vanryn while J.V.'s mother ("J.V.'s mother") worked. After moving into Mother's house, Vanryn, who was not employed, became the primary caregiver for the three children while Mother worked a full-time job.

[2] Shortly after moving into Mother's house, Vanryn began texting Mother at work to complain about two-year-old M.G. For example, in June 2017, Vanryn texted Mother that M.G. had "pissed and shit his bed again. [I don't know], he seems fine, he just keeps pooping and peeing in his diaper and not saying anything to anyone about having to go to the potty." (Tr. Vol. 2 at 200).

[3] In July 2017, Vanryn texted Mother that M.G. had "started screaming and crying when he – we told him that he couldn't have milk in his cereal[.] It's . . .

annoying and he's a brat[.] [H]e fucking gets it everywhere and he's two, he doesn't need milk in his cereal, . . . I'm the adult and I said so." (Tr. Vol. 2 at 200). Later that month, Vanryn texted Mother as follows:

> [M.G.]'s grounded for the rest of the day. He just shit his pants for the second time today. He was literally sitting right next to me and took a shit and didn't say anything[.] I smelled shit and was like, [t]here's no way. He must have just farted. He wouldn't do that sitting right here. Well, sure enough. He keeps saying, '[p]oop in toilet,' but he doesn't. I don't get it. He knows where to go and how to ask. I was sitting right next to him, for Christ's sake. This is the second time today[.] [H]e fucking knows better[.] He knows it's bad and he gets in trouble, but he keeps doing it. I was right next to him on the couch. There's no fucking excuse[.] [I]f you want to keep making excuses for him, I'll just let him sit in it and every day after work you can come home and deal with it. All you've done after shit – all you've done after h[e's] shit his pants day in and day out, two, even three times a day some days, is making fucking excuses for him and I'm over it. He knows better, point blank, period.

(Tr. Vol. 2 at 200-01).

[4] Also in July 2017, M.G. spent the day with Mother's father ("Maternal Grandfather"). Maternal Grandfather, who had previously noticed that M.G. had begun having bruises when Vanryn had moved into Mother's house, saw a handprint-shaped bruise on M.G.'s buttocks. When Mother picked up M.G., Maternal Grandfather confronted her. She "made up an excuse and denied any abuse." (Tr. Vol. 2 at 35). Maternal Grandfather went to Mother's house and confronted Vanryn, who "came back at [Maternal Grandfather.]" (Tr. Vol. 2 at 35). Mother became angry and threatened to call the police. Thereafter,

Mother changed her telephone number and "completely stopped talking to [Maternal Grandfather]." (Tr. Vol. 2 at 35).

[5] Vanryn continued to text Mother at work about M.G. In August 2017, Vanryn texted Mother that M.G. had "just got the belt pretty good[.] He's in deep fucking trouble[.]" (Tr. Vol. 2 at 201). Later that day, Vanryn texted Mother as follows:

> Well, M.G. just slipped and fell in the damn shower[.] This shit is too much[.] [M.G.] busted his damn lip in the shower. I've got a million kids running around, people are . . . shitting themselves, falling in the shower. I need a fucking break. I don't know what exactly he hit, I just heard a thud, then him start crying. I'm guessing he hit the ledge of the tub[.] [His lip is] bleeding pretty good.

(Tr. Vol. 2 at 202).

[6] In October 2017, M.G.'s paternal great-grandmother ("Paternal Great-Grandmother") stopped by Mother's home on a weekend afternoon to ask Mother if Paternal Great-Grandmother could take M.G. for a visit with his cousins. While at Mother's home, Paternal Great-Grandmother noticed that M.G. had dark circles under his eyes, a bruise on the right side of his face, and marks around his neck. When Paternal Great-Grandmother left Mother's home, she contacted the police and DCS to request a welfare check on M.G.

[7] DCS case worker Amanda Treska ("Case Worker Treska") went to Mother's home that same day. When Case Worker Treska arrived at Mother's home, the case worker noticed that M.G. had dark circles under his eyes, a bruise on his

cheek, and a scratch on his neck.  Case Worker Treska also noticed that M.G., who was very pale, had a cut on his upper lip that was in the process of healing.  Mother explained that M.G. had cut his lip when he had fallen in the shower.  Mother also told the case worker that the dark circles under M.G.'s eyes were the result of an allergic reaction to laundry detergent.  Case Worker Treska recommended that Mother have M.G., who was very quiet while the case worker was in the home, examined by a pediatrician.  Both Mother and Vanryn signed a safety plan wherein they agreed to "refrain from physical discipline that result[ed] in marks or bruises." (Tr. Vol. 2 at 117).  M.G.'s case was later closed as unsubstantiated.

[8]     In early November 2017, Vanryn texted Mother that he was "done watching the kids from now on.  You need to find daycare.  You need to find a sitter or some kind of daycare[.]  I'm not watching them tomorrow.  I will leave before you go to work if I have to." (Tr. Vol. 2 at 203).  On November 27, 2017, Vanryn texted Mother as follows:

> [M.G.] peed his pants again[.]  He went in the bathroom and put toilet paper in his underwear, trying to hide it, just like he did with that curtain in your room[.]  He's in trouble for the rest of the day.  I've had to give him two baths, wash all his sheets and blankets, both outfits he wore today.  This is ridiculous.

(Tr. Vol. 2 at 203-04).  None of the text messages that Vanryn sent to Mother on November 27 and 28, 2017, mentioned that M.G. was ill.

[9]     On November 29, 2017, Mother left for work at 7:30 a.m., and K.H. left for school shortly thereafter. Vanryn was at home with M.G. and J.V. until approximately 1:00 p.m., when J.V.'s mother picked J.V. up. While at the home, J.V.'s mother noticed that M.G. had a bruise on the side of his face. After J.V. and his mother had left, Vanryn and M.G. were the only two people at home for three hours until M.G.'s maternal great-grandmother ("Maternal Great-Grandmother") brought K.H. home from school at approximately 4:15 p.m. Maternal Great-Grandmother asked to see M.G., but Vanryn told her that he was sleeping. After Maternal Great-Grandmother had left the house, Vanryn told K.H. to go outside and jump on the trampoline. When K.H., who was not wearing shoes or socks, asked to come in the house because her feet were cold, Vanryn would not allow her back into the house. K.H. heard Vanryn yelling at M.G. to wake up.

[10]    At approximately 4:30 p.m., Vanryn ran out of the house with M.G. in his arms. Vanryn ran to a nearby fire station, where he told the firefighters that he had been unable to wake M.G. so he had placed the toddler in the shower. Vanryn further told the firefighters that he had attempted to give M.G. mouth-to-mouth resuscitation when the toddler had stopped breathing. Vanryn never told the firefighters that he had given M.G. chest compressions or CPR.

[11]    One of the firefighters placed M.G. on the firehouse's kitchen table to evaluate and attempt to treat him. The firefighter noticed that M.G. had bruises on his hands, cheek, shoulder, back, and groin. Shortly thereafter, an ambulance arrived to take M.G. to the hospital. The paramedic noticed that M.G. had

several different bruises of different colors, which indicated that the bruises had been inflicted at different times and were in different stages of healing. The paramedic documented the bruises before she performed CPR on M.G.

[12] M.G. died shortly after he arrived at the hospital. The pediatric critical care physician, who examined M.G. and who had been trained in the signs of child abuse, was concerned about the placement and extent of M.G.'s bruises.

[13] Fort Wayne Police Department Detective Liza Anglin ("Detective Anglin") videotaped an interview with Vanryn shortly after M.G. had died. Vanryn told Detective Anglin that M.G. had been sick for three days prior to his death and had had frequent urination and defecation accidents during that time. Vanryn also told Detective Anglin that M.G. had bruised easily. Vanryn explained that M.G. had taken a nap that day after J.V. had gone home with his mother. When Vanryn had attempted to wake M.G. at 4:15 p.m. after K.H. had returned home, M.G. was unresponsive. Vanryn had attempted to wake M.G. by shaking him, slapping his face, and putting him in the shower. According to Vanryn, M.G.'s jaw had been clenched shut. Vanryn had tried to pry it open so that he could give M.G. mouth-to-mouth resuscitation. Vanryn explained that he had taken M.G. to a nearby fire station when he was unable to wake the toddler. At the end of the interview, Detective Anglin told Vanryn that M.G. had exhibited several indicators of abuse. Vanryn responded that DCS had just closed its case and an autopsy would show that M.G. had not been abused. Vanryn never mentioned during the interview that he had performed chest compressions or CPR on M.G.

[14] On November 30, 2017, Dr. Robert Wagner ("Dr. Wagner") performed an autopsy on M.G. Following the autopsy, Dr. Wagner identified the cause of M.G.'s death as: "Hemoperitoneum due to a Laceration of Pancreas, Duodenum, and Mesentery Due to Blunt Force Injury of the Abdomen." (Ex. Vol. at 139). Dr. Wagner identified the manner of M.G.'s death as a homicide.

[15] Also on November 30, 2017, Alysha Tun ("Tun"), who had known Mother for ten to twelve years, heard about the toddler's death and went to Mother's Facebook page to see if Mother had posted any information regarding the cause of M.G.'s death. Tun saw that Mother had just posted a video of Mother and M.G. In the Facebook post, Mother had identified the video as the last one that she had taken of M.G. the night before he died. Tun watched the video ("the Facebook video") of M.G. and Mother and heard M.G. tell Mother that Vanryn had hit M.G.'s head. Although Tun watched the video "before anyone had even [been] accused [of] any sort of foul play or anything," Tun was concerned about what she had heard on the Facebook video. (Tr. Vol. 2 at 127). Tun told her father about the Facebook video and subsequently sent it to her father's friend, who worked at the police department.

[16] On December 1, 2017, forensic interviewer Patricia Smallwood ("Smallwood") interviewed six-year-old K.H. at the Dr. Bill Lewis Center for Children. K.H. told Smallwood that M.G. had been afraid of Vanryn. According to K.H., every time M.G. had urinated or defecated in his pants, Vanryn had spanked M.G. with Vanryn's hand, a wooden spoon, or a black belt. K.H. further told Smallwood that the spankings had left bruises on M.G.'s buttocks.

[17]     In December 2017, the State charged Vanryn with murder, Level 1 felony aggravated battery, and Level 2 felony domestic battery. Vanryn's three-day jury trial began in March 2019. The jury heard the facts as set forth above and watched the videos of Detective Anglin questioning Vanryn and Smallwood questioning K.H.

[18]     Also at trial, Vanryn objected when the State offered the Facebook video into evidence during Tun's testimony. Vanryn specifically argued to the trial court in a sidebar conference that although Tun could "testify that she saw the video on a certain day, we have no idea when the video was actually created." (Tr. Vol. 2 at 123). The State responded that "[y]ou c[ould] clearly see that the child ha[d] a mark on his lip from the stitches . . . it ha[d] to have been taken after the bathtub incident because he ha[d] a scar on his lip." (Tr. Vol. 2 at 123). The State also pointed out that Mother had said on her Facebook post that it was the last video that she had taken of M.G. the night before he died. The trial court admitted the Facebook video into evidence over Vanryn's objection.

[19]     Detective Anglin also testified at trial. During her testimony, she reviewed photographs of M.G. and described M.G.'s injuries that she had seen at the hospital and during his autopsy as follows:

> [M.G. had] bruising on the left side of his face and on the left forehead. On the heel of his foot there was bruising on his ankle. There [were] bruises on his right arm, forearm. There [were] bruises on his back, and the round bruises on his back and down the center of his back and over on his left side. Right in the center of his head, just about where his hairline changes, there [was] a large bruise on the back of his head[.] There [was]

bruising on his left shoulder[.] His belly was distended. It was full. It looked like it was – it was just full. And there [was] a bruise on his belly, as well[.] When they opened up [M.G.] at the autopsy, his belly was full of blood, just pooled around all of his organs and his internal midsection. There [was] more bruising to his chest. Bruises on his hands, on the inside of his hands. Bruising on his left shoulder[.] [B]ruising at the base of the neck also.

(Tr. Vol. 2 at 214-15).

[20] In addition, Dr. Wagner's trial testimony further explained that M.G.'s "belly [was] distended" and full of blood because "a massive blunt force injury" to M.G.'s abdomen had "ripped open" M.G.'s duodenum, or small intestine, and his pancreas. (Tr. Vol. 3 at 88, 91, 92, 93). In addition, according to Dr. Wagner, M.G.'s mesentery, which "holds everything together in your stomach" was "shredded apart," and M.G.'s liver was "ripped in half." (Tr. Vol. 3 at 92). Dr. Wagner further testified that the blunt force injury had also "torn apart" the blood vessels in M.G.'s abdomen. (Tr. Vol. 3 at 92). In addition, Dr. Wagner testified that this blunt force injury was consistent with having been caused by a "a very hard kick, a very hard punch" or "a fall from a three-story building." (Tr. Vol. 3 at 100). According to Dr. Wagner, M.G. could not have survived more than an hour or two after the blunt force injury had occurred. Dr. Wagner also pointed out that the oval bruise patterns on M.G.'s lower back and upper chest were consistent with the knuckle pattern of a fist. In addition, Dr. Wagner testified that M.G. had a "large goose egg" on his scalp. (Tr. Vol. 3 at

106).  Dr. Wagner further opined that M.G.'s injuries were not consistent with someone having performed CPR on the toddler.

[21]     Vanryn testified that he had been a father figure to M.G. and that M.G. had called him "dad."  (Tr. Vol. 3 at 141).  Vanryn admitted that he had been frustrated with M.G. in the days before M.G. died because "who likes cleaning up a dirty . . . diaper?"  (Tr. Vol. 3 at 143).  Vanryn explained that, on November 29, 2017, when M.G. had failed to respond to Vanryn's attempts to awaken him, Vanryn had attempted CPR on M.G.  Vanryn specifically explained as follows:

> I haven't had any kind of formal training, so I did things that I kind of remembered from bits and pieces.  I first started with a couple compressions to the upper chest area.  I then tried to deliver a few breaths, but his jaw was clenched, it was clenched shut.  I tried to stick my pointer finger behind it to kind of pry it open so I could give actual breaths, but I couldn't, so I tried to administer those breaths as best as I could.  When I did this, out of my peripheral I could see with every breath that his stomach started to inflate.  When that happened - I know that that's not a good thing and it's not a good sign, so I moved my hands from the chest area down to the abdominal area, figuring that if I had some kind of pressure on that area, that that air would not go to that area, and that's when I started to deliver those same compressions in that area.

(Tr. Vol. 3 at 155-56).

[22]     Defense counsel asked Vanryn how he had applied CPR, and Vanryn responded that he had "balled [his] hand up and [had given] the compressions."  (Tr. Vol. 3 at 156).  Vanryn did not know how much force he had used but he

explained that he had been "in an excited state" and had felt "a sense of urgency and panic." (Tr. Vol. 3 at 156, 157).

[23] After the parties had presented their evidence, Vanryn tendered a reckless homicide instruction and asked the trial court to instruct the jury on this lesser included offense of murder. The trial court responded as follows to defense counsel's request:

> Unfortunately, [defense counsel], you're right, I've probably presided over more murder cases than I care to count or recall, and I think it's been very helpful because the Supreme Court has indicated to us that the three-part test of Wright is: Is it factually included? Is it inherently included? And the Supreme Court's been very kind to tell us that it is a lesser included, period. So reckless homicide is a lesser-included offense of murder. The third step then: Is there a serious evidentiary dispute? I'm very familiar with the case law cited by defendant that when it's a close call it is prudent to give it, I absolutely agree with that. In this situation, however, I don't see that there is a serious evidentiary dispute.

(Tr. Vol. 3 at 188). Accordingly, the trial court refused to give Vanryn's tendered lesser included offense instruction.

[24] The jury convicted Vanryn of Level 1 felony aggravated battery and Level 2 felony domestic battery and acquitted him of murder.

[25] At the sentencing hearing, the State presented testimony that Vanryn had previously beaten Mother with a pool stick and shoved her to the ground. Vanryn had also punched and thrown the family's dog. The State also

presented evidence that Vanryn had previously been abusive to J.V.'s mother, who had called the police multiple times during the course of their relationship to report incidents of domestic violence. Vanryn's PSI revealed that he had said that he was "remorseful that by performing CPR[,] he caused [M.G.'s] injuries." (App. Vol. 2 at 114). Vanryn also stated that he believed that he should have attempted to seek outside help before performing CPR on M.G.

[26] At the conclusion of the sentencing hearing, the trial court found the following aggravating and mitigating factors and sentenced Vanryn as follows

> [T]he Court finds the Defendant guilty of aggravated battery, a [L]evel one felony, in count two; the Court finds the Defendant guilty of domestic battery, a [L]evel two felony, in count three. In the sentencing memorandum submitted to the Court, your attorney has advanced several mitigating circumstances that he is asking the Court to consider. He has asked that I consider that the crime is a result of circumstances unlikely to recur. I specifically decline to find that as a mitigating circumstance based on the information contained in some of these police reports and correspondence from your former wife. He has further asked that I consider the fact that you have no history of delinquent or criminal activity or you've led a law-abiding life for a substantial period of time before the commission of the crime. That is correct, you have no criminal activity on your record, so I do find that specifically to be a mitigating circumstance. He has asked that I consider that you are likely to respond affirmatively to probation or a short term of imprisonment. I can't read your mind, Mr. Vanryn, I don't know how you will respond. You clearly didn't respond to the State's efforts on the pre-trial diversion that you were offered, as referenced in the sentencing memorandum, you clearly didn't respond to the intervention of the authorities in any of the police reports that were submitted by the State of Indiana, and I decline to find that to be a mitigating

circumstance. Your attorney has also asked that I consider your remorse. You've indicated that you are sorry. Oftentimes, remorse is pity for oneself and what oneself finds themself in, but I will accept that as a mitigating circumstance. And your attorney has finally asked that I consider that the character and attitudes of yourself indicate that you are unlikely to commit another crime. I can't do that, Mr. Vanryn, based on the information that I've received here in the sentencing hearing. You are a powder keg likely to go off and that is a truly frightening thing, sir. I do find as aggravating circumstances that the victim was substantially younger than the statutory age of 14 for a [L]evel one felony and substantially younger than the statutory aggravator of 12 years of age, this little boy was two years old, that's been considered by the higher courts of record as an extremely tender age and I find that to be a significant aggravator. You're a grown man against a two-year-old child who had no chance. You violated the position of trust you were in. You were his caregiver while Mother was working, and instead of taking care of him, you beat him to death. This was a crime of violence that was committed in the presence or hearing of a person less than 18 years of age. [K.H.] was outside, and whether she knows what happened in that house or not, she heard what happened in that house, and she told us what happened in that house. I find that the nature and circumstances of the crimes to be an aggravator. I've been on the bench 22 years, Mr. Vanryn, I've not seen such a horrific crime. Prior to my time on the bench, I served in the criminal justice system and saw very few crimes like this. To indicate in this courtroom, after all of the medical evidence that was presented, that the compressions that were applied to [M.G.'s] abdomen caused these injuries is preposterous and ludicrous and insulting to the intelligence of every person sitting in this room. Those compressions would have had to have had the force of a fall from a three-story building, sir. That clearly is not what happened in that home, and I've heard no explanation yet, other than that of Dr. Wagner, for the bruising that looked remarkably like the knuckles of a grown man. It is therefore ordered that the

> Defendant be committed to the Indiana Department of
> Correction for classification and confinement for a period of 40
> years on count two and a period of 30 years on count three, order
> those to be served concurrently.

(Tr. Vol. 4 at 3-5).

Vanryn now appeals his convictions and sentence.

# Decision

Vanryn argues that: (1) the trial court abused its discretion in admitting evidence; (2) the trial court abused its discretion in instructing the jury; (3) there is insufficient evidence to support his conviction; and (4) his sentence is inappropriate in light of the nature of the offense and the character of the offender. We address each of his contentions in turn.

## 1. Admission of Evidence

Vanryn first argues that the trial court abused its discretion in admitting evidence. The admission of evidence is within the sound discretion of the trial court, and we will reverse only for an abuse of that discretion. *Rogers v. State*, 897 N.E.2d 955, 959 (Ind. Ct. App. 2008), *trans. denied*. A trial court abuses its discretion if its decision is clearly against the logic and the effect of the facts and circumstances before the court or if the court has misinterpreted the law. *Id.*

Vanryn specifically argues that the trial court abused its discretion when it admitted the Facebook video in violation of Indiana Rule of Evidence 404(b). Indiana Evidence Rule 404(b) prohibits a trial court from admitting evidence of

another crime, wrong, or act "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the person's character." Ind. Evidence Rule 404(b)(1). The purpose of the rule is to protect against the forbidden inference that the defendant acted badly in the past, and that the defendant's present, charged actions conform with those past bad acts. *Erickson v. State*, 72 N.E.3d 965, 973-74 (Ind. Ct. App. 2017), *trans. denied*.

[31]     Evidence of crimes, wrongs, or other acts are admissible if offered for another purpose, such as to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Evid. R. 404(b)(2). In assessing the admissibility of 404(b) evidence, we: (1) determine whether the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's propensity to commit the charged act; and (2) balance the probative value of the evidence against its prejudicial effect pursuant to Rule 403. *Erickson*, 72 N.E.3d at 974.

[32]     Here, Vanryn does not argue that the Facebook video was prior bad act evidence. Rather, he argues that the trial court abused its discretion when it admitted the Facebook video because "the State failed to sufficient[ly] establish the timeliness of the video." (Vanryn's Br. 28). In support of his argument, Vanryn cites *Pirnat v. State*, 612 N.E.2d 153, 155 (Ind. Ct. App. 1993), *abrogated by Hicks v. State*, 690 N.E.2d 215 (Ind. 1997), for the proposition that "evidence must be similar enough and close enough in time to be generally relevant to the charged offenses." (Vanryn's Br. 28). *Pirnat* applied the Seventh Circuit's four-part test for the admissibility of 404(b) evidence, which included a factor that

"the other evidence must be similar enough and close enough in time to be relevant to the matter in issue[.]" *Pirnat*, 612 N.E.2d at 155 (citing *United States v. Hudson*, 884 F.2d 1016, 1018-19 (7th Cir. 1989), *cert. denied* 496 U.S. 939 (1990)).

[33]  However, in *Hicks*, 690 N.E.2d at 219, the Indiana Supreme Court determined that the requirement that the prior bad act must be similar and close in time to the charged conduct in order to be relevant "unnecessarily restrict[ed] the discretion of the trial court to determine whether 404(b) evidence [was] relevant." Rather, our supreme court determined that the trial court's wide discretion in ruling on the relevancy of evidence "includes determining the significance of the similarity or remoteness of evidence." *Id.* at 220. According to our supreme court, although "[s]ome proffered evidence may be irrelevant because it is too remote[,] an event occurring in the past can be critical." *Id.* Therefore, "admissibility hinges on relevance, not a litmus test based on an isolated factor – remoteness, similarity, or anything else – that may bear on relevance." *Id.*

[34]  We further note that the State established the timeliness of the Facebook video in two respects. First, Mother stated in her Facebook post that it was the last video that she had taken of M.G. the night before he died. In addition, the video showed the scar on M.G.'s lip, which was caused by M.G.'s fall in the shower and which was still healing just one month before M.G.'s death. The trial court did not abuse its discretion when it admitted the Facebook video into evidence.

## 2. Jury Instructions

[35] Vanryn next argues that the trial court abused its discretion in instructing the jury. Vanryn specifically contends that the trial court abused its discretion when it declined to give his tendered lesser-included offense instruction for reckless homicide on the murder count. In *Wright v. State*, 658 N.E.2d 563, 566 (Ind. 1995), the Indiana Supreme Court set forth a three-part test that trial courts should perform when called upon by a party to instruct the jury on a lesser-included offense to the crime charged. First, the trial court must compare the statute defining the crime charged with the statute defining the alleged lesser-included offense to determine if the alleged lesser-included offense is inherently included in the crime charged. *Id.* Second, if the trial court determines that an alleged lesser-included offense is not inherently included in the crime charged under step one, then it must determine if the alleged lesser-included offense is factually included in the crime charged. *Id.* at 567. If the alleged lesser-included offense is neither inherently nor factually included in the crime charged, the trial court should not give an instruction on the alleged lesser-included offense. *Id.* Third, if a trial court has determined an alleged lesser-included offense is either inherently or factually included in the crime charged, "it must look at the evidence presented in the case by both parties" to determine if there is a serious evidentiary dispute about the element or elements distinguishing the greater from the lesser offense and if, in view of this dispute, a jury could conclude that the lesser offense was committed but not the greater.

*Id.* It is reversible error for a trial court not to give a requested instruction on inherently or factually included lesser offenses if there is such an evidentiary dispute. *Id.* We now apply this framework to the tendered lesser-included offense instruction in this case.

[36] Reckless homicide is an inherently included lesser offense of murder. *Id.* The only element distinguishing the two offenses is the defendant's state of mind. *Id.* Reckless homicide occurs when the defendant "recklessly" kills another human being. IND. CODE § 35-42-1-5. Reckless conduct is action taken in plain, conscious, and unjustifiable disregard of harm that might result. IND. CODE § 35-41-2-2(c). In addition, the disregard involves a substantial deviation from acceptable standards of conduct. *Id.*

[37] Murder, on the other hand, occurs when the killing is done "knowingly" or "intentionally." I.C. § 35-42-1-1. A person engages in conduct "knowingly" if the person is aware of a high probability that he is doing so. I.C. § 35-41-2-2(b). Accordingly, Vanryn was entitled to an instruction on reckless homicide if there was a serious evidentiary dispute permitting the jury to find that he recklessly but not knowingly killed M.G. *See McEwen v. State,* 695 N.E.2d 79, 85 (Ind. 1998).

[38] Here, our review of the evidence reveals that Vanryn inflicted severe blunt force trauma to M.G.'s abdomen. This trauma, which nearly tore in half M.G.'s duodenum and pancreas, shredded his mesentery, ripped his liver in half, and tore apart his abdominal blood vessels, was consistent with a very hard punch

or a fall from a three-story building. The Indiana Supreme Court has previously held that the infliction of such severe blunt force trauma is evidence of an awareness of a high probability that the victim will be killed. *See Anderson v. State*, 681 N.E.2d 703, 708, 709 (Ind. 1997) (explaining that where the nearly two-year-old victim "suffered severe blunt force injuries about the head, chest, and abdomen [and] [t]he extreme injuries to the chest consisted of bruises or contusions of the chest wall, as well as a rupture of the diaphragm . . . tears to the esophagus . . . as well as tears in the stomach so that there was actually gastric contents and blood in the chest cavity[,]" there was no serious evidentiary dispute that when Anderson was hitting the toddler, Anderson was aware of the high probability that his conduct would result in the toddler's death). Based on this evidence, there was no serious evidentiary dispute permitting the jury to find that Vanryn recklessly killed M.G. *See id*. Accordingly, the trial court did not abuse its discretion when it refused to give the jury Vanryn's tendered instruction on the lesser-included offense of reckless homicide.

### 3. Sufficiency of the Evidence

[39] Vanryn also argues that there is insufficient evidence to support his conviction for Level 1 felony aggravated battery. Our standard of review for sufficiency of the evidence claims is well-settled. We consider only the probative evidence and reasonable inferences supporting the verdict. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). We do not reweigh the evidence or judge witness credibility. *Id.* We will affirm the conviction unless no reasonable fact finder

could find the elements of the crime proven beyond a reasonable doubt. *Id.* The evidence is sufficient if an inference may be reasonably drawn from it to support the verdict. *Id.* at 147.

[40] In order to convict Vanryn of Level 1 felony aggravated battery, the State had the burden to prove beyond a reasonable doubt that Vanryn knowingly or intentionally inflicted injury on M.G. that resulted in M.G.'s death. *See* IND. CODE § 35-42-2-1.5. The State also had to prove that M.G. was a child less than fourteen years old and that Vanryn was at least eighteen years old. *Id.*

[41] Vanryn's sole argument is that the State failed to establish beyond a reasonable doubt that he intentionally inflicted injury on M.G. A person acts "intentionally" when "it is his conscious objective to do so." I.C. § 35-41-2-2(a). Intent is a mental function. I.C. § 35-41-2-2(a). "Intent is a mental function; and so, absent an admission, it 'can be inferred from a defendant's conduct and the natural and usual sequence to which such conduct logically and reasonably points.'" *Heuring v. State*, 140 N.E.3d 270, 275 (Ind. 2020) (quoting *Phipps v. State*, 90 N.E.3d 1190, 1195-96 (Ind. 2018)). Intent may also be inferred from the nature of the attack and the circumstances surrounding the crime. *Burns v. State*, 59 N.E.3d 323, 328 (Ind. Ct. App. 2016) (finding sufficient evidence that Burns intended to kill the victim), *trans. denied*. The duration, brutality, and relative strengths of the defendant and victim are factors that can be considered by the jury as indications of the defendant's intent. *Id*.

Here, our review of the evidence reveals that while Vanryn and M.G. were alone together in the home, twenty-seven-year-old Vanryn brutally inflicted such severe trauma on two-year-old M.G.'s abdomen that the toddler's duodenum and pancreas were nearly torn in half, his mesentery was shredded, his liver was ripped in half, and his abdominal blood vessels were torn apart. These injuries were consistent with having been caused by a very hard punch or a fall from a three-story building. This evidence, which is sufficient to establish that Vanryn intentionally inflicted injury on M.G., is sufficient to support Vanryn's Level 1 felony aggravated battery conviction.

## 4. Inappropriate Sentence

Vanryn also argues that his aggregate forty (40) year sentence is inappropriate. According to Vanryn, "an appropriate sentence would have been thirty (30) years." (Vanryn's Br. 36).

Indiana Appellate Rule 7(B) provides that we may revise a sentence authorized by statute if, after due consideration of the trial court's decision, we find that the sentence is inappropriate in light of the nature of the offense and the character of the offender. The defendant bears the burden of persuading this Court that his sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006). Whether we regard a sentence as inappropriate turns on the "culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008).

[45] When determining whether a sentence is inappropriate, we acknowledge that the advisory sentence is the starting point the Legislature has selected as an appropriate sentence for the crime committed. *Childress*, 848 N.E.2d at 1081. Here, Vanryn was convicted of Level 1 felony aggravated battery and Level 2 felony domestic battery. The sentencing range for a Level 1 felony is from twenty (20) to forty (40) years, with an advisory sentence of thirty (30) years. I.C. § 35-50-2-4. The sentencing range for a Level 2 felony is from ten (10) to thirty (30) years, with an advisory sentence of seventeen and one-half (17½) years. The trial court sentenced Vanryn to forty (40) years for the Level 1 felony and thirty (30) years for the Level 2 felony. The trial court further ordered the sentences to run concurrently with each other, for an aggregate forty (40) year sentence.

[46] With regard to the nature of the offense, Vanryn, whom M.G. called "dad," brutally inflicted such severe trauma on the toddler's abdomen that the toddler's duodenum and pancreas were nearly torn in half, his mesentery was shredded, his liver was ripped in half, and his abdominal blood vessels were torn apart. These injuries were consistent with having been caused by a very hard punch or a fall from a three-story building. In addition, the trial court stated during the sentencing hearing that it had "not seen such a horrific crime." (Tr. Vol. 4 at 5).

[47] With regard to Vanryn's character, we note that Vanryn physically abused M.G. for the six months preceding the toddler's death. When two-year-old M.G. urinated or defecated in his pants, Vanryn spanked M.G. with Vanryn's

hand, a wooden spoon, or a belt, leaving bruises on M.G.'s buttocks. Vanryn also beat Mother with a pool stick and shoved her to the ground. In addition, Vanryn punched and threw the family's dog. Vanryn had also previously been abusive to J.V.'s mother, who had called the police multiple times to report incidents of domestic violence during the course of their relationship. We agree with the trial court's characterization of Vanryn as "a powder keg likely to go off[.]" (Tr. Vol. 4 at 4).

[48] Based on the nature of the offense and his character, Vanryn has failed to persuade this Court that his aggregate forty (40) year sentence is inappropriate.

[49] Affirmed.

May, J., and Crone, J., concur.